The **COMMITTEE FOR GI RIGHTS**
**et al., Appellees,**

**v.**

**Honorable Howard H. CALLAWAY,**
**Secretary of the Army, et al.,**
**Appellants.**

**No. 74–1285.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 23, 1975.

Decided Sept. 2, 1975.

As Amended Sept. 23, 1975.

David F. Addlestone, Washington, D. C., with whom Susan H. Hewman, Washington, D. C., Joel M. Gora, Melvin L. Wulf, New York City, Arpiar G. Saunders, Washington, D. C., Robert Rivkin, Howard DeNike, San Francisco, Cal., were on the Brief for appellees.

Edwin E. Huddleson, III, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and William Kanter, Atty., Dept. of Justice, were on the Brief for appellants. Michael A. Katz & Royce C. Lamberth, Asst. U. S. Attys., at the time the brief was filed, also entered appearances for appellants.

Charles M. Butler, III, Dallas, Tex., filed a brief on behalf of Senators John Tower and Strom Thurmond, as amici curiae urging reversal.

Before MacKINNON and WILKEY, *Circuit Judges,* and JAMESON,* *United States Senior District Judge* for the District of Montana.

Opinion for the Court filed by *Senior District Judge* JAMESON.

JAMESON, *Senior District Judge:*

This is an appeal from an order of the district court declaring unconstitutional

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

and enjoining the enforcement of certain provisions of the United States Army's drug abuse prevention and control program embodied in USAREUR Circular 600–85.[1]

### Background

Recognizing "that drug abuse is a profoundly serious national problem that is having a grave effect on the Armed Forces",[2] the Congress in 1971 directed the Secretary of Defense to "prescribe and implement procedures, utilizing all practical available methods, and provide necessary facilities to (1) identify, treat, and rehabilitate members of the Armed Forces who are drug or alcohol dependent persons, . . .". Pub.L.No.92–129, Title V (Sept. 28, 1971). Pursuant to this directive, the United States Army in Europe (USAREUR) embarked on a program to eradicate drug abuse in its ranks. In the initial stages of the program, the details were left to local commanders. As a result of alleged abuses, plaintiffs-appellants, 18 members of the Army stationed in Europe,[3] and an organization known as the Committee For GI Rights,[4] commenced this class action on behalf of approximately 145,000 GIs[5] in the Army's European Command, claiming that various features of the drug abuse prevention plan were uncon-stitutional and seeking declaratory and injunctive relief.

In an order denying plaintiffs' motion for a preliminary injunction, the district court directed that the Secretary of the Army file "a detailed written statement of the procedures and directives it intend[ed] to use in carrying out the drug elimination program in the German Command". In response to this directive, the Secretary of the Army promulgated USAREUR Circular 600–85, outlining the rehabilitation and prevention procedures of the drug program and eliminating some of the objectionable features previously urged by the plaintiffs. The action was thereby narrowed to the constitutionality of the Circular.

### The Drug Control Program

The purpose of the drug control program as outlined in Circular 600–85 is to restore to effective and reliable functioning members of the Armed Forces with problems attributable to alcohol and other drugs; and to eliminate from the service those who cannot be effectively restored in a reasonable period of time. The program consists primarily of three phases: identification, evaluation, and rehabilitation. The Circular classifies abusers as (a) those *suspected*[6] of alcohol or drug abuse; (b) those who are *identi-*

1. The opinion of the district court appears at 370 F.Supp. 934.

2. U.S.Code Congressional and Administrative News, 92nd Cong., 1st Sess., 1971, Vol. 2, p. 1505.

3. The complaint, filed April 30, 1973, alleges that all of the named plaintiffs "are . . . active duty members of the United States Army, stationed at American military installations in Europe". There is nothing in the record to show whether the status of any of them may have changed subsequent to filing this action.

4. As defined by plaintiffs in their complaint, the Committee For GI Rights is an unofficial, unincorporated association of American military personnel, formed in Butzbach, West Germany in February, 1973, in order to protest the policies and practices which give rise to this lawsuit.

5. The class consists of all persons in the United States Army stationed in Europe, between the ranks of Private (E–1) and Specialist Fifth Class (E–5). The district court certified the class, pursuant to Rules 23(b)(2) and 23(c) of the Federal Rules of Civil Procedure. 370 F.Supp. at 937.

6. A person is classified as a suspected alcohol or drug abuser if there is credible information that (1) he was under the influence of drugs or showed excessive use of alcohol; or (2) at least two of the following apply: (a) he was in the company of individuals when they were using illegal drugs and was aware of it; (b) he has displayed unexplained changes in job performance, behavior, or physical condition related to the use of alcohol or drugs; (c) he regularly frequents known drug sales points. Cir. 600–85, para. 7a.

*fied* [7] as alcohol or drug abusers; (c) those whose urinalysis indicates a positive drug content; and (4) those who are *medically confirmed* [8] alcohol or drug abusers. Identification of drug users may be made through inspections, described *infra,* which are authorized under the Circular.

When a soldier has been identified as a possible drug user, on the basis of an inspection or otherwise, he is subject to mandatory drug processing. Initially, he is confronted by his commanding officer, who informs him of the evidence against him, warns him of his rights and gives him the opportunity to provide additional evidence on his behalf.[9] The commanding officer thereafter may refer the soldier to a Community Drug and Alcohol Assistance Center (CDAAC),[10] which interviews the identified abuser and determines the nature and extent of drug or alcohol involvement. If there is credible evidence of drug abuse, the soldier is sent to a Medical Treatment Facility (MTF) for clinical evaluation. At the MTF, a physician, applying medical standards, determines whether the soldier is a drug abuser. Counsel is provided during the MTF interviews if requested. When a soldier has been medically determined to be a "confirmed drug abuser", the MTF either admits him to a hospital or returns him to the CDAAC for design of a formal 60 day rehabilitation program. Rehabilitation programs are individualized and are designed to involve the commander, CDAAC counselor, other counseling services and medical facilities. Periodic urinalysis and other testing may be part of the rehabilitation program. In addition, the commander is authorized to impose various administrative sanctions [11] (discussed *infra*) not as punishment but as part of the rehabilitation program.

At the end of the 60 day rehabilitation period, the commanding officer, with the assistance of the CDAAC, makes a determination as to rehabilitative success or failure. If the soldier is determined to be a "rehabilitative failure", he is processed for administrative discharge under circumstances that may adversely affect his military record.[12] If he is a rehabilitative success, active rehabilitation ceases, followed by 300 days of follow-up testing and observation, including unannounced urinalysis testing twice a month.

While the primary purpose of the drug control program is the rehabilitation of

---

7. A person is classified as an identified alcohol or drug abuser if there is "clear and convincing evidence" of any of the following: (1) self-admitted current abuse; (2) illegal possession of controlled substances as defined in Army Regulation 600–50, or substances or drug paraphernalia prohibited by USAREUR Regulation 632–10; (3) illegal or improper use of drugs other than alcohol; (4) drunk driving; (5) public drunkenness; (6) disorderly conduct with alcohol or other drug involvement; and (7) drunk on duty. Cir. 600–85, para. 8a.

8. An individual may be medically confirmed as a result of (1) referral from the Community Drug and Alcohol Assistance Center (CDAAC); (2) medical examination or treatment based on drug related hepatitis, injuries resulting from drug or alcohol misuse, alcohol or drug intoxication, medical complication with alcohol or other drug involvement, and other medical evidence (e. g., needle marks). Cir. 600–85, para. 10a.

9. Those drug abusers who fall into the category "Medically Confirmed" (footnote 8) are placed immediately into a rehabilitation program.

10. In the case of a soldier identified by means of urinalysis, the commanding officer has no option but must refer the soldier to the CDAAC.

11. As provided in Cir. 600–85, para. 14d(3), prior to medical confirmation of drug abuse by the MTF, no disciplinary or rehabilitative measures may be taken except temporary suspension of access to classified material, loss of flight status, suspension of nuclear duty, and, if the soldier has been involved in an automobile accident, temporary suspension of his driver's license.

12. Normally, the discharge will be either an honorable or a general discharge. This is required when the evidence of a GI's drug abuse falls within the exemption policy (see note 13, *infra*). Under certain conditions, however, non-exempt evidence may lead to a discharge under other than honorable conditions. Cir. 600–85, Annex F.

drug abusers, the Circular does provide that disciplinary action may be taken when the facts and circumstances associated with drug abuse indicate violations of the law or Army regulations.[13] In addition, the Circular, together with Army Regulation 340–17, permits military authorities to advise other governmental agencies, upon request, of a discharged soldier's former involvement with drugs. The record of a soldier's drug abuse may also be considered by the Army in connection with future personnel action, i. e. duty assignments and promotions.

### Poster Regulation

The USAREUR's poster regulation (Circular 600–85, para. 14d(4)) permits commanding officers to prohibit the display on barrack walls of posters which in their judgment constitute a "clear danger to military loyalty, discipline or morale". The regulation does not provide for confiscation of the poster; nor does it prohibit a soldier from showing the poster to others. The regulation explicitly refers to and incorporates the guidelines set forth in a letter entitled "Guidance on Dissent", AGAM–P, Headquarters, Department of the Army, 23 June 1969, which provides in part:

> "Dissent, in the literal sense of disagreement with policies of the Government, is a right of every citizen. In our system of Government, we do not ask that every citizen or every soldier agree with every policy of the Government . . . The right to express

opinions on matters of public and personal concern is secured to soldier and civilian . . . The interest of the Government and the public in maintenance of an effective and disciplined Army for the purpose of National defense justifies certain restraints upon the activities of military personnel which need not be imposed on similar activities by civilians."

### Decision of the District Court

By memorandum opinion dated January 14, 1974, D.C., 370 F.Supp. 934, and order entered February 8, 1974, the district court on cross-motions for summary judgment granted the plaintiffs-appellees partial relief by holding certain provisions of USAREUR Circular 600–85 unconstitutional and issuing a mandatory injunction. Specifically, the court held that the warrantless drug inspections authorized by the Circular without a showing of probable cause were not justified by military necessity and that the use of the information gained by the searches as a basis for imposing punitive sanctions, including less than honorable discharge, violated the soldier's rights under the Fourth Amendment. The court did, however, state in its order of February 8, 1974 that the Army could continue "conducting drug inspections or requiring participation in a drug testing and rehabilitation program without probable cause, so long as evidence or information obtained as a result of such procedures is not used as a basis for any punitive action . . .".

**13.** USAREUR Circular 600–85, Annex I establishes a general exemption policy whereby "a soldier who requests rehabilitation help, is mandatorily referred, or otherwise obtains help for a drug problem is exempt from disciplinary action under the UCMJ and from discharge under less than honorable conditions for prior use or incidental possession of drugs for his personal use occurring before he asked for or otherwise received help . . .". Annex I para. 2c provides:

> "The exemption policy also applies to soldiers identified as drug abusers by involuntary urinalysis and clinical evaluation by a physician. Evidence obtained directly or indirectly as a result of urinalysis administered

for the purpose of identifying drug users, evidence attributable to the volunteering for treatment, or any admission made by the service member after mandatory referral may not be used, in whole or in part, to support a disciplinary action under the UCMJ or an undesirable discharge."

The exemption policy does not insulate from disciplinary action incidents of personal drug use or possession which were previously known to military officials. (Annex I para. 2b). Nor does it apply to the sale of drugs or to other offenses which may be motivated by drug abuse. (Annex I para. 2a).

The court held further that the "administrative sanctions", which the Circular authorizes the commanding officer to impose after a soldier has been designated a confirmed drug abuser by the MTF, significantly affected a GI's liberty or property, and imposition of those sanctions without affording the GI a prior hearing constituted a violation of the GI's right to due process under the Fifth Amendment. The court also held that the Circular's poster regulation was impermissible, finding that the "clear danger to military loyalty, discipline, or morale" standard was "too vague a standard by which to regulate First Amendment liberties". Finally, the court held that the provisions permitting the dissemination of drug information to non-military government agencies and to civilian applicants violated 21 U.S.C. § 1175.

### Issues on Appeal

The following issues are presented:

(1) Whether the court lacked jurisdiction by reason of plaintiffs-appellees' (a) lack of standing, (b) failure to establish the requisite jurisdictional amount, and (c) failure to exhaust military remedies.

(2) Whether the Army's warrantless drug inspections conducted without probable cause and designed to ferret out illegal drugs constituted a violation of the Fourth Amendment.

(3) Whether the Army was required under the Due Process Clause of the Fifth Amendment to afford a soldier a hearing before imposing non-medical administrative remedies intended to aid the soldier in his drug rehabilitation program.

(4) Whether the "clear danger to military loyalty, discipline, or morale" standard found in the poster regulation was unconstitutionally vague and infringed on the GI's First Amendment rights.

### I. Jurisdiction

#### A. Standing

■ Appellants contend that appellees do not have standing to challenge the entire drug control program, but rather under their allegations of "injury in fact" are confined "to the drug inspections and those few administrative measures which they themselves have incurred". Appellants argue that at the very most appellees have standing to raise only the following issues:

"(1) the validity of USAREUR drug inspections;

"(2) the scope of procedural due process requirements for withdrawing civilian clothing privileges or storing such clothing outside the barracks area, suspending a soldier's driver's license, temporarily withdrawing pass privileges, requiring occupied rooms to remain unlocked, and confiscating incense and 'black' light apparatus;[14] and

"(3) the validity of the USAREUR poster regulation."

In the context of the Army drug prevention and control program, we conclude that appellants have taken too narrow a view of standing. It is, of course, well settled by *Baker* v. *Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) and many subsequent decisions of the Supreme Court that the "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions". Whether a party has the requisite personal stake in the outcome depends "upon the circumstances of the particular case". *Flast* v. *Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

The plaintiffs have been and continue to be subjected to drug inspections which

---

**14.** It is true, as appellants contend, that many of the allegations of "injury in fact" set forth in affidavits submitted by the plaintiffs were complaints with respect to measures which were subsequently prohibited by the Circular.

may serve to identify them for purposes of mandatory drug processing and even criminal prosecutions. Members of the plaintiff class may be swept into the drug program on the basis of suspicion of drug abuse, which in turn may be established by criteria such as unexplained changes in job performance, behavior, or physical condition related to the use of drugs or the frequenting of known drug points.[15] Various administrative measures already have been imposed on many of the named plaintiffs, and the poster regulations are applicable to all. In short, the named plaintiffs and the other members of the class are subject to all aspects of the on-going Army drug program which allegedly violates their constitutional rights.[16] Under these circumstances, we conclude that the plaintiffs-appellees' involvement in the drug prevention and control program was sufficient to give them standing to challenge the constitutionality of the entire program.

### B. *Jurisdictional Amount*

The district court found jurisdiction under 28 U.S.C. § 1331(a).[17] Citing *Tatum v. Laird*, 144 U.S.App.D.C. 72, 444 F.2d 947, 951 (1971), *rev'd on other grounds*, 408 U.S. 1, 92 S.Ct. 231, 33 L.Ed.2d 154 (1972), the court said: "The rights here in issue have a value in excess of $10,000 at least as to many members of the plaintiff class; and in addition the cost to the Army of enforcing the rights claimed by plaintiffs might well exceed the required $10,000".

◼ In *Tatum v. Laird* this court held that the amount in controversy may be measured either by the "value of the right sought to be gained by the plaintiff or the cost of enforcing that right to the defendant". *Id.* at 951. Quoting from *Ronzio v. Denver & R. G. W. R. R.*, 116 F.2d 604, 606 (10 Cir. 1940), the court noted ". . . the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce". 444 F.2d at 951, n. 6 (1973). Viewing this case either from the standpoint of the plaintiffs or the defendants, we conclude that the jurisdictional amount was satisfied with respect to each member of the plaintiff class.

Determining jurisdictional amount from the plaintiffs' position is a difficult, if not impossible, task in view of the fact that basic civil rights are at stake and the claim is for injunctive rather than financial relief. Nevertheless, as this court said in *Gomez v. Wilson*, 155 U.S. App.D.C. 242, 477 F.2d 411, 420, n. 51 (1973):

"Although the value of certain rights may be difficult of precise measurement, that difficulty does not make the claim non-justiciable under Section 1331(a). . . . Absolute certainty as to the amount is not essential; it suffices that there is a present probability that the damages or the right sought to be protected meet the statutory requirement." [18]

---

**15.** The complaint alleges that, "Each of the named plaintiffs has been subjected to and/or fears that he will be subjected to one or more of the practices complained of herein".

**16.** This is not a case wherein all the named plaintiffs are no longer subject to the program or where the challenged regulations have been abandoned. *See, e. g., Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

**17.** 28 U.S.C. § 1331(a) provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and

arises under the Constitution, laws, or treaties of the United States".

The Supreme Court has stressed that even "in suits against federal officers for alleged deprivations of constitutional rights, it is necessary to satisfy the amount-in-controversy requirement for federal jurisdiction". *Lynch v. Household Finance Corp.*, 405 U.S. 538, 547, 92 S.Ct. 1113, 1119, 31 L.Ed.2d 424 (1972).

**18.** *Gomez v. Wilson* recognized that some courts have held that civil rights are incapable of valuation and thus no jurisdiction lies under § 1331(a), while other courts have held that "some rights are so fundamental that their inherent worth must be equal to any amount set

■ All of the plaintiffs-appellees were subjected to drug inspections and the challenged poster regulation. In addition, various administrative measures were taken against named plaintiff-appellees, including withdrawal of passes, suspension of drivers' licenses, confiscation of civilian clothing, selective urinalysis testing, and public identification as suspected drug users. The constitutional issues raised by the plaintiffs are not frivolous. Given the serious nature of the injuries alleged and the consequences that the individual GI may suffer as a result of the challenged drug program, we cannot say that the value of the rights of each of the plaintiffs affected by the Army's drug program does not satisfy the § 1331(a) jurisdictional amount.[19]

Alternatively, we agree with the district court that the jurisdictional amount is also satisfied with respect to all of the plaintiffs because of the costs that the Army would incur if the plaintiffs prevailed. The cost to the Army in that event would be the cost of (1) stopping the drug inspections entirely or providing a warrant procedure for inspections; (2) providing a hearing prior to the imposition of administrative measures; (3) eliminating other challenged aspects of the drug program, i. e., the poster regulation. Considering both the prospective tangible cost of additional hearings and

intangible cost of drug abuse among personnel as the result of an adverse ruling, we agree with the district court that the cost to the defendants might well exceed $10,000.

### C. Exhaustion of Military Remedies

Appellants contend that the federal courts lack jurisdiction because plaintiffs-appellees failed to exhaust their military remedies and that the exercise of jurisdiction interferes with pending military proceedings. They argue that (1) military proceedings under Article 138 of the Uniform Code of Military Justice (10 U.S.C. § 938) and before the Inspector General (Army Regulation 20–1) are available for purposes of challenging various aspects of the Circular, and (2) objections to the Circular could be raised as a defense in a court martial or in an action commenced by a GI before the Board for the Correction of Military Records (10 U.S.C. § 1552) and the Discharge Review Board (10 U.S.C. § 1553) for purposes of correcting his military records and challenging his discharge from the military service.

■ As a general rule, the exhaustion of administrative remedies provided by the military service is a required predicate to relief in the civil courts. *McGee* v. *United States*, 402 U.S. 479, 483–488, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971); *United States ex rel. Taylor* v.

---

for jurisdictional purposes". *Id.* at 420–421, n. 56. Taking a middle position, the court said:
"... [N]otwithstanding a deep-seated feeling that price-tagging of fundamental human rights is dangerous business, we realize that any automatic finding of the required amount in controversy just because such rights are in issue may be a more simplistic solution than § 1331(a) will tolerate. Moreover, we find it hard to believe that demonstration of jurisdictional amount is a difficult undertaking where the right asserted is truly basic. At least for the time being, then, we will cling to the middle course which permits complainants in suits under § 1331(a) for injunctive relief against federal and District officers to allege and show that the value of the rights sought to be protected exceeds the required jurisdictional amount." *Id.*

19. As noted in *Tatum* v. *Laird, supra* at 950, n. 3, cases of this nature which raise substantial constitutional questions lend support to the position that the jurisdictional amount requirement should not be applied to defeat federal jurisdiction when fundamental constitutional rights of intangible value are involved. As stated by the American Law Institute in its "Study of the Division of Jurisdiction Between State and Federal Courts, 172 (1969):
The few cases there are ... that must satisfy the § 1331 requirement are likely to involve matters particularly deserving of a federal forum .... Cases in which the plaintiff claims violation of his constitutional rights by action of a federal official warrant federal cognizance without the need for demonstrating that the requisite amount is in controversy."

*Fritz,* 446 F.2d 36, 37 (8 Cir. 1971); *Sohm* v. *Fowler,* 124 U.S.App.D.C. 382, 365 F.2d 915, 917, 918 (1966). The primary reasons for requiring exhaustion in both the military and civilian contexts are: (1) to prevent interference by the courts in matters which in the first instance require the exercise of either agency discretion or expertise; (2) to maintain the autonomy and assure the proper functioning of the administrative system Congress has structured; (3) to avoid unnecessary interference with ongoing administrative processes; and (4) to assure judicial efficiency, i. e., successful vindication of rights in administrative process may negate need for judicial review. *McKart* v. *United States,* 395 U.S. 185, 193–195, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The exhaustion doctrine is not inflexible and when the reasons supporting the doctrine are found inapplicable, the doctrine should not be blindly applied.

▆ In this case no significant interest is served by forcing the plaintiffs-appellees to proceed through military channels. The issues involved are purely legal, requiring no exercise of military discretion or expertise. The federal courts are in a better position to consider the constitutional issues presented than are the various military bodies referred to by the appellants. Moreover, the military tribunals are not designed to handle actions involving so large a class and seeking declaratory and injunctive relief. Rather, actions before the Inspector General as well as court martials and other military proceedings are designed primarily to deal with cases involving some specific misconduct by or complaint on the part of an individual GI. To require exhaustion of military remedies would merely delay a decision by the federal courts.[20] We hold that exhaustion of military remedies was not necessary.

20. Moreover, in view of the fact that the Army prepared the Circular in direct response to the district court's order that the Army clarify its

## II. *Constitutional Issues*

▆ Subsequent to the district court's opinion and order, a number of cases have been decided by the Supreme Court and this court which have recognized the differences between military and civilian life and the constitutional standards to be applied to each. *See, e. g., Parker* v. *Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Secretary of the Navy* v. *Avrech,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974); *Schlesinger* v. *Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); and *Carlson* v. *Schlesinger,* 167 U.S.App.D.C. 325, 511 F.2d 1327 (1975). While reaffirming the general principle that the members of the Armed Forces are entitled to constitutional protections, these cases stress that "the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside of it." *Parker* v. *Levy, supra,* 417 U.S. at 758, 94 S.Ct. at 2563. We rely on that standard in reversing the district court and holding Circular 600–85 constitutional.

## A. *Fourth Amendment Violation— Drug Inspections*

USAREUR Circular 600–85, Annex I para. 3a authorizes warrantless drug inspections without probable cause. As stated by the Circular,

"Search and seizure restrictions do not limit the commander's authority to conduct inspections. An inspection does not presuppose a criminal offense and is not a search for evidence. It may be used for the purpose of examining the clothing, equipment, and arms of a unit to determine its fitness and readiness to perform its mission,

position, exhaustion would in all likelihood be futile and therefore is unnecessary. *Dooley* v. *Ploger,* 491 F.2d 608, 614–615 (4 Cir. 1974).

or to seek out contraband (e. g. illegal weapons, explosives, drugs)."

The Circular stresses that a drug inspection must not be a "subterfuge for searching the person or property of one or more individuals who are suspected of misconduct before the inspection and, thereby, the actual reason for the inspection". Cir. 600–85, Annex I para. 3b.[21]

The Circular further provides:

"Inspections of skin areas for indications of possible drug abuse will be conducted with as much privacy as possible. Inspections of the groin or anal area will be conducted only by qualified medical personnel and only in complete privacy. Intrusions into the body are prohibited without probable cause or medical necessity." Cir. 600–85, para. 14d(5).

In holding invalid the warrantless inspections authorized by the Circular, the district court noted that by reason of their intrusive nature the inspections were "not analogous to the Army's traditional preparedness inspections", but constituted mass searches which "would be illegal in a civilian context in the absence of particularized probable cause",

citing *Lankford* v. *Gelston,* 364 F.2d 197 (4 Cir. 1966). The court concluded that the Army had failed to establish military necessity for its program and since the drug inspections were not based on probable cause they violated appellees' Fourth Amendment rights. The court emphasized that the inherent difficulty with the USAREUR drug program "is that it attempts to deal with the drug abuse problem not only as a health problem, as Congress intended, but also as a disciplinary problem". Recognizing the value of the drug inspections for rehabilitative purposes, the court permitted the inspections to continue so long as evidence thereby obtained was not used as a basis for punitive action.

To permit an intrusive search without probable cause for purposes of a drug rehabilitation program but deny the use of the results of the search for purposes of discipline presents both practical and legal problems. If the inspections are legal, any evidence of crime obtained therefrom may be used in subsequent criminal action. *See United States* v. *Skipwith,* 482 F.2d 1272, 1277–1279 (5 Cir. 1973), *cf. United States* v. *Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).[22]

**21.** The Circular outlines the conduct of a drug inspection as follows:

"In conducting inspections, commanders will:

(1) Allow the individual to be present in his room during the inspection, unless he is unable to be there because of cogent reasons. (If the inspection is merely a walk-through and does not involve going through the individual's military or personal property, his presence is not necessary.)

(2) Inspect all personnel to the same degree.

(3) Examine such personal items as wallets, pictures, open envelopes, and letters only cursorily, if at all, and only for presence of contraband.

(4) Treat each individual and his possessions with dignity and avoid undue harassment.

(5) Inspect without the assistance of military police or other police personnel except for the assistance of dog handlers when drug detector dogs are used.

(6) Warn the individual of his rights before asking him any questions regarding ille-

gal items found among his possessions or on his person during an inspection." Cir. 600–85, Annex I para. 3c.

Annex C para. 5c, permitting the use of detector dog teams in public areas and billets, provides that:

"If such inspections are likely to lead to the identification of individuals who should be subject to disciplinary action, prior consultation with the commander who can authorize a search is essential. The commander must be thoroughly briefed by the dog handler about the training of the dog, his reliability and the action of the dog when alerting on drugs. If the commander is satisfied with the technical proficiency of the dog and his handler, the alert of the detector dog during the inspection may constitute probable cause for a search. The appropriate commander may then authorize the search."

**22.** *United States* v. *Ruiz,* 23 U.S.C.M.A. 181, 48 C.M.R. 797 (1974) is inapposite. In *Ruiz,* the court held that a GI could not be punished for refusing to furnish a urine sample since the evidence that could be obtained from a urinal-

■ The controlling question, therefore, is whether the warrantless drug inspections violate the Fourth Amendment.[23] We recognize, of course, that GIs are entitled to the protection of the Fourth Amendment as are all other American citizens. As the Court noted in *Terry* v. *Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), however, the "specific content and incidents of [one's rights under the Fourth Amendment] must be shaped by the context in which [they are] asserted". Reasonableness is the controlling standard. *Cady* v. *Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Camara* v. *Municipal Court,* 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). What is reasonable in one context may not be reasonable in another. As this court stated in *Carlson* v. *Schlesinger, supra* at 1331, "To strike the proper balance between legitimate military needs and individual liberties we must inquire whether 'conditions peculiar to military life' dictate affording different treatment to activity arising in a military context." (citation omitted).

■ There are a number of factors to consider in determining whether the challenged drug inspections are unreasonable under the Fourth Amendment. While no one factor is controlling, we conclude that in totality the following factors compel a conclusion that in the military context the procedures set forth in the Circular are not unreasonable:

1. The increased incidence of drug abuse in the Armed Forces poses a substantial threat to the readiness and efficiency of our military forces.[24] Unlike the civilian population, the military forces are charged with the responsibility of continuously protecting the nation's interests both on the domestic and international level.[25] Widespread use of marijuana, hashish and other drugs can have a serious debilitating effect on the ability of the Armed Services to perform their mission. As noted in the extensive evidence submitted by the appellants, drug use among GIs in the USAREUR had (a) lessened the on-the-job efficiency of GIs; (b) significantly reduced the number of effective soldiers in the European command; (c) required the expend-

ysis could be used to incriminate him. The evidence in that case established that the commanding officer desired to utilize the results of the urinalysis against the accused in an administrative discharge proceeding. Unlike the present case, no Fourth Amendment issues were raised in *Ruiz.* The court was concerned only with the accused's right against self-incrimination under U.C.M.J. Article 31(a), 10 U.S.C. § 831(a), which the court concluded had a "broader sweep than the Fifth Amendment to the United States Constitution."

23. The Fourth Amendment provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches* and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added).

24. As noted by the Supreme Court in its recent decision in *Schlesinger* v. *Councilman,* 420 U.S. 738, 760, 95 S.Ct. 1300, 1314 n. 35, 43 L.Ed.2d 591, 610 n. 35 (1975):

"The seriousness of the problem is indicated by information presented before congressional committees to the effect that some 86,000 servicemen underwent some type of rehabilitation for drug abuse in fiscal

years 1972 and 1973, and only 52% of these were able to return to duty after rehabilitation. . . . It is not surprising, in view of the nature and magnitude of the problem, that in *United States* v. *Beeker,* 18 U.S.C. M.A. 563, 565, 40 C.M.R. 275, 277 (1969), the Court of Military Appeals found that 'use of marijuana and narcotics by military persons on or off a military base has special military significance in light of the disastrous effects' of these substances 'on the health, morale and fitness for duty of persons in the Armed Forces.'"

25. The district court recognized that surveys of drug abuse in the European command revealed a "fairly stable level of daily drug use: ten to fifteen percent for cannabis and one to two-and-one-half percent for other drugs", but concluded that it was "certainly clear that drug used in the Command has not reached anything comparable to the epidemic proportions detected in Vietnam and is not particularly different from drug abuse encountered among civilians in major United States cities". We question whether a comparison of drug abuse in the USAREUR with civilian drug abuse in major cities is entirely apt. See note 24.

iture of enormous amounts of supervisory time to monitor all aspects of the drug control and rehabilitation process; (d) strained the limited medical resources of the European Command; (e) created a significant health threat; and (f) resulted in an increased incidence of crime.

2. The "expectation of privacy", *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring), is different in the military than it is in civilian life. Military inspections have been traditionally accepted and are expected by soldiers. From his first day in boot camp, the soldier has come to realize that unlike his civilian counterpart he is subject to extensive regulation by his military superiors. The soldier cannot reasonably expect the Army barracks to be a sanctuary like his civilian home.

3. The primary purpose of the drug inspections is to ferret out illegal drugs as a means of protecting the health of the unit and assuring its fitness to accomplish its mission. Any punitive actions that might subsequently follow are incidental.[26]

4. Given the nature of drugs and the paraphernalia associated therewith, unannounced drug inspections appear to be the most effective means of identifying drug users so that they might receive treatment and eliminating illegal and debilitating drugs from a unit.

5. In authorizing drug inspections, the Army has attempted to guard the dignity and privacy of the soldier insofar as practical.

When these factors are balanced against the GI's interest in his own personal privacy and security, the balance weighs heavily in favor of the drug inspections. We find the drug inspections to be reasonable.

The fact that the inspections are accomplished without a warrant does not change the result. While as a general rule, searches and administrative inspections may not be initiated in the absence of a warrant or consent by the person or persons being searched or inspected, *Camara, supra,* 387 U.S. at 528, 529, 87 S.Ct. 1727, conducting the drug inspections without a warrant does not render them *per se* unreasonable. As noted by the Court in *Camara, supra,* at 533, 87 S.Ct. at 1733: "In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search".

We agree with amici curiae that to require a warrant as a precondition for a valid drug inspection would prove unduly burdensome and would severely undermine the effectiveness of the drug inspections. Given the great number of Army units that are periodically subjected to unannounced drug inspections under the program, the time and effort that would be required if a warrant procedure were necessary would discourage Army administrators from conducting drug inspections. Furthermore, the possibility of advance notice of inspections would be significantly increased. This would give drug abusers the opportunity to conceal illegal drugs, thus to some extent minimizing the effectiveness of the drug inspections.

In summary, we conclude that the warrantless drug inspections under the procedures prescribed in USAREUR Circular 600–85 are reasonable and constitutionally permissible under the Fourth Amendment.

---

**26.** It may be noted that even a search for negligently kept or abused equipment or failure to follow Army regulations concerning cleanliness and orderliness of barracks may result in disciplinary proceedings.

B. *Administrative Sanctions—Denial of Due Process*

Once a soldier has been determined to be a confirmed drug abuser, various non-medical administrative tools may be employed by the commanding officer as part of a "rehabilitative program coordinated with the community drug and alcohol abuse center". Among those tools are:

(1) withdrawal of the drug abuser's privilege of wearing civilian clothing and requiring him to remove his civilian clothing from the barrack area;

(2) denial of pass privileges, thus confining the soldier to the installation;

(3) suspension of his privately owned vehicle or military driver's license;

(4) prohibition against the burning of odor-producing substances other than tobacco in the barracks;

(5) requiring abusers, whether married or single, to move into the barracks;

(6) segregation of abusers in one part of the barracks;

(7) suspension or revocation of class VI privileges; and

(8) requiring the soldier to keep his or her room unlocked when the room is occupied. Cir. 600–85, Annex J para. 2. The tools may be utilized by the unit commander when he believes that they will aid the medically confirmed drug abuser in the rehabilitation process by making it more difficult for him to purchase, use or possess illegal drugs.[27]

Other administrative measures authorized by the Circular include (1) confinement in a live-in/work-out rehabilitation facility, Cir. 600–85, Annex A;[28] and (2) requiring the drug abuser to participate in a urinalysis testing program wherein he must furnish three urine samples a week for eight weeks, Cir. 600–85, para. 12. Medically confirmed drug abusers who prove to be rehabilitative successes are subject to a 300 day follow-up, during which unannounced urinalysis tests will be required.

Appellees contend, and the district court found, that the failure to afford a hearing prior to the imposition of these administrative "sanctions" constituted a violation of the due process rights of the GIs.

The concept of due process was aptly described in *Hagopian* v. *Knowlton,* 470 F.2d 201, 207 (2 Cir. 1972):

" . . . it must be recognized that due process is not a rigid formula or simple rule of thumb to be applied undeviatingly to any given set of facts. On the contrary, it is a flexible concept which depends upon the balancing of various factors, including the nature of the private right or interest that is threatened, the extent to which the proceeding is adversarial in character, the severity and consequences of any action that might be taken, the burden that would be imposed by requiring use of all or part of the full panoply of trial-type procedures, and the existence of other overriding interests, such as the necessity for prompt action in the conduct of crucial military opera-

---

**27.** The Circular states:

"Not every administrative tool is appropriate in every case; each tool used must relate in some reasonable way to the particular soldier's needs. Any rehabilitation program must be adjusted to the individual's strengths and weaknesses and be carefully monitored by the commander as to the duration and austerity, in coordination with the CDAAC and the medical treatment facility (MTF)." Annex J para. 1.

**28.** The live-in/work-out rehabilitation facility is an extension of the CDAAC and is for the abuser who, "while not requiring the intensive program offered by resident rehabilitation facilities (RRF) does require a more structured environment during off duty hours, particularly during the initial phase of a rehabilitation program . . . Personnel may remain in the Live-in/Work-out Program for only a few days and only in exceptional cases will the time exceed two weeks." Entry into the program is restricted to those soldiers who the commander and the CDAAC staff consider will benefit from the program. Cir. 600–85, Annex A.

tions. The full context must therefore be considered in each case."

In considering the administrative measures authorized by the Circular, we again stress that they must be viewed in the military context. While not medical remedies, these administrative tools are medically related. They constitute an integral part of the rehabilitation program designed for GI drug abusers. As discussed previously, vital national interests require an effective drug prevention and rehabilitation program in the Armed Forces.

The Circular specifically requires that "any rehabilitation program must be . . . carefully monitored by the commander as to duration and austerity, in coordination with the CDAAC and the medical treatment facility". Annex J para. 1. Thus, those administrative measures applied to a particular GI are not simply imposed on an ex parte basis by the commander. Furthermore, contrary to the position of appellees, a strict time limitation is placed on the measures. The administrative tools as set forth in Annex J of the Circular, may only be imposed during the active rehabilitation process, i. e. for 60 days.

Given the nature and purpose of the administrative measures authorized by the Circular, together with the vital governmental interests involved, we hold that the Army need not provide a GI a hearing prior to the imposition of the measures. The individual GI cannot be said to suffer any "grievous loss" which

"outweighs the governmental interest in summary adjudication". *Goldberg* v. *Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). To require the Army to provide a GI with a hearing prior to the imposition of any action which would affect his liberty or property interests would seriously erode the Army's ability to maintain a disciplined and ready fighting force. In addition, it would impose substantial administrative burdens by requiring the Army to conduct a significantly greater number of hearings each month. Finally, a GI who desires to challenge the imposition of an administrative measure can do so by a complaint procedure after the measure has been imposed. 10 U.S.C. § 938.[29]

## C. The Poster Regulation

██ The sole question with respect to the poster regulation is whether the "clear danger to military loyalty, discipline, or morale" standard by which officers are to judge posters is impermissibly vague. In *Secretary of the Navy* v. *Avrech, supra,* the Court upheld a clause of the Uniform Code of Military Justice making criminal the publication of statements disloyal to the United States "with design to promote disloyalty and disaffection among the troops".[30] The standard upheld in *Avrech* and the standard challenged in this case are indistinguishable.[31] We conclude that the poster regulation is not unconstitutionally vague.[32]

---

**29.** The cases relied on by the district court and the appellees, *Morrissey* v. *Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Fuentes* v. *Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Bell* v. *Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); and *Wisconsin* v. *Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), are distinguishable. In none of those cases did the Court consider the application of the due process guarantee in a military context.

**30.** The Court in *Avrech* relied on its earlier decision in *Parker* v. *Levy, supra,* wherein the Court upheld two provisions of the Uniform Code of Military Justice—Article 133 making

conduct "unbecoming an officer and a gentleman" a criminal offense; and Article 134 punishing, *inter alia,* "all disorders and neglects to the prejudice of good order and discipline in the armed forces".

**31.** *Parker* v. *Levy, supra,* and *Avrech* were both decided by the Supreme Court after the decision of the district court in this case. In *Avrech* the Court reversed a decision of this court holding the code provision unconstitutionally vague and overbroad. The district court relied upon that decision in support of its conclusion that the poster regulation was impermissibly vague.

**32.** See also the recent decision of this court in *Carlson* v. *Schlesinger, supra,* holding that in a

### III. *Conclusion*

Maintaining the proper balance between the legitimate needs of the military and the rights of the individual soldier presents a complex problem which lends itself to no easy solution. With the advent of the all volunteer Army in recent years, the Armed Forces have improved conditions of military life by providing greater benefits and a broader scope of individual freedom to the enlisted man. Nevertheless, the fact remains that discipline and fitness are prerequisites of an effective military force. We have set out in some detail the regulations of the USAREUR Circular to show the precautions taken by the Army to safeguard the constitutional rights of the GI in the drug program. Recognizing the inherent differences between military life and civilian life and the vital interest of the nation in maintaining the readiness and fitness of its Armed Forces, we conclude that all of the challenged regulations are reasonable and constitutionally valid.

Reversed.

---

combat zone (Vietnam) the requirement that all petitions be approved prior to circulation was reasonable, and the refusal of the commanding officer to permit a petition to be circulated calling for an end to further U.S. involvement in Vietnam was justified.