BAKER, Judge,
joined by STUCKY, Judge (concurring in part and dissenting in part):
INTRODUCTION
The majority reaches two conclusions. First, it concludes that it was plain and obvious error to admit the cover memorandum reporting the results of the urinalysis. United States v. Sweeney, 70 M.J. 296, 304 (C.A.A.F. 2011). This conclusion is supported by the holding in United States v. Blazier (Blazier II), 69 M.J. 218 (C.A.A.F. 2010), with which I concur. A cover memo drafted specifically for use at a court-martial reporting urinalysis test results is testimonial and falls squarely within the Supreme Court’s Crawford v. Washington[1] line of cases.
Second, the majority concludes that it was also plain error to admit the specimen custody document certification, also known as De *307 partment of Defense (DD) Form 2624. Sweeney, 70 M.J. at 304. This is the Department of Defense’s basic chain of custody form for running its urinalysis program, for purposes of military readiness as well as for purposes of military justice.[2] I would not find plain error with respect to the admission of this document or any other urinalysis documents.
As discussed below, Bullcoming v. New Mexico, — U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), delimits the reach of Crawford, as did Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), before. Among other things, Bull-coming requires lower courts to consider the primary purpose behind documents, and the statements therein, at the time they were created. 131 S.Ct. at 2717. Justice Sotoma-yor’s decisive concurring vote also suggests that an alternate purpose for creating the document and the statements therein may change the analysis as well. Id. at 2720. (Sotomayor, J., concurring in part).
What the primary purpose was for filling out the DD 2624 at issue in this case at the time it was filled out, as well as the statements it contains if any, has not been litigated but can only be inferred at this point. However, clearly, there was an alternate purpose to the urinalysis document at issue in this case as well as the information it contained. This is manifest in Department of Defense regulations. It is manifest in the mission statement of the testing laboratory. And it is manifest from the testimony at trial. To the extent that the Supreme Court’s guidance is clear as to how it would apply in a military context, it is clear only with respect to the cover memorandum expressly prepared for trial as in Blazier II and in this case. As a separate matter, neither Bull-coming nor any other of the Supreme Court’s Crawford cases addresses the distinct and specific constitutional questions raised in the context of a military urinalysis program addressed to military readiness as well as military justice. Nor do these cases address the possible implications of other constitutional principles that might impact the analysis, including the President’s authority as Commander-in-Chief, Congress’s “Rules and Regulations” authority under Article I of the United States Constitution,[3] and exceptions contained within the text of the Sixth Amendment[4] applied to members of the armed forces.[5] Whether the constitu *308 tional rights of military persons will be implicated in the same ways as civilians in the context of the Confrontation Clause[6] and urinalysis has not been litigated or addressed by the Supreme Court or this Court.[7] At a minimum, before this area of law is set, the issues should be fully litigated and adjudicated at the appellate level before this Court. Contrary to the majority view, the issue that divides the majority and the dissent is not whether the confrontation clause applies but how.
Until these issues are addressed, this Court should interpret Crawford and Bull-coming with a high degree of contextual caution. Moreover, without addressing these questions it is not clear how we can find plain error in the admission of urinalysis documents that are generated not for a specific trial, but as part of the military’s worldwide urinalysis program. Nevertheless, it appears unlikely that the drug testing report, other than the cover memorandum, is testimonial under Supreme Court precedent, especially given the circumstances of this case.
DISCUSSION
I. From Crawford to Bullcoming
In Crawford, 541 U.S. at 61, 124 S.Ct. 1354, the Supreme Court held that the Sixth Amendment’s Confrontation Clause is not a guarantee of “amorphous notions of ‘reliability.’ ” It is not a substantive but a procedural right to “testing in the crucible of cross-examination” before admitting prior testimonial statements of witnesses who are unavailable at trial. Id. Further, the Court held that “even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.” Id. at 53, 124 S.Ct. 1354; see Davis, 547 U.S. at 823, 126 S.Ct. 2266.
In Melendez-Diaz v. Massachusetts, the Supreme Court held that the Confrontation Clause required more than unsupplemented “affidavits,” and a witness must testify where the documents were “made for the purpose of establishing or proving some fact ... [and were] functionally identical to live, in-court testimony.” 557 U.S. 305, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009).
The Court subsequently refined and to a certain extent delimited Crawford. In Davis, for example, the Court introduced a “primary purpose” test holding that a 911 call was not testimonial because the statements were “made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” 547 U.S. at 822, 126 S.Ct. 2266. On the other hand, where the “primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution,” the statements are testimonial. Id. In Michigan v. Bryant, the Court applied the primary purpose test to hold admissible the statements of a man who had been shot, under an “ongoing emergency” primary purpose test:
Because the circumstances of the encounter as well as the statements and actions of [the declarant] and the police objectively indicate that the primary purpose of the *309 interrogation was to enable police assistance to meet an ongoing emergency, [the declarant’s] identification and description of the shooter and the location of the shooting were not testimonial hearsay.
- U.S. -, 131 S.Ct. 1143, 1166-67, 179 L.Ed.2d 93 (2011) (citation and quotation marks omitted).
Finally, in Bullcoming, the Court addressed a blood analysis report from the Scientific Laboratory Division of the New Mexico Department of Health — a report created specifically and exclusively for a criminal trial in New Mexico. 131 S.Ct. at 2710. In that context, the majority concluded that the Confrontation Clause did not permit “the prosecution to introduce a forensic laboratory report containing a testimonial certification— made for the purpose of proving a particular fact — through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification.” Id. However, the majority also noted, “[t]o rank as ‘testimonial,’ a statement must have a ‘primary purpose’ of ‘establishing] or proving] past events potentially relevant to later criminal prosecution.’ ” Id. at 2714 n. 6.
Justice Sotomayor’s fifth and deciding vote delineates the opinion’s reach:
First, this is not a ease in which the State suggested an alternate purpose, much less an alternate primary purpose, for the BAC report ....
Second, this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue ....
Third, this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence ....
Finally, this is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph ...
Id. at 2722 (Sotomayor, J., concurring in part).
II. Bullcoming Applied
The present case activates all but one of Justice Sotomayor’s caveats, placing into question how, if at all, Crawford applies to any of the underlying urinalysis documents in this case. However, one need look no further than the first of these caveats to determine that there was no plain error in this case with respect to the DD Form 2624 and the certification contained on it. Bull-coming clearly establishes a purpose test as a core element of the Crawford analysis. Indeed it suggests that the identification of an alternative purpose for the drug report and the information contained within it might change the analysis. Contrary to the majority opinion’s assertion, the sole purpose of military urinalysis testing in general, and particularly the information contained in the DD 2624 in this case, was not to “provid[e] urinalysis drug testing that is scientifically valid and forensically acceptable as evidence in courts of law,” employing “certain procedures ‘to ensure that the integrity of ... the evidence has been ... preserved.’ ” Sweeney, 70 M.J. at 299 (alterations in original). That is relevant testimony, for sure. But it does not in fact address the question as to what, under Davis and Bullcoming, the primary purpose is behind military urinalysis testing in general, or more specifically what the primary purpose, or alternate purpose of the test and the information contained in the DD 2624 at issue in this case was at the time the form was filled out. Rather the quoted testimony responds to a line of questions about the reliability of urinalysis testing intended to give the members confidence in the result, not so that they can apply the Supreme Court’s analysis in Davis.
Department of Defense regulations make it clear that, at minimum, there are alternate purposes for the creation of the custodial document, certification, and related attachments. The military drug testing program operates under Department of Defense regulations. Dep’t of Defense Dir. 1010.1, Military Personnel Drug Abuse Testing Program (Dec. 9, 1994) (incorporating Change 1, Jan. 11, 1999). This directive mandates three purposes for drug testing: (1) to deter military members and those entering active duty *310 from abusing drugs; (2) “to permit commanders to detect drug abuse and assess the security, military fitness, readiness, good order, and discipline of their commands”; and (3) “as a basis to take action, adverse or otherwise (including referral for treatment), against a Service member based on a positive test result.” Id. at para. 3.1. The certification at the bottom of the DD 2624 therefore serves more than one purpose. It assures commanders as well as members of the armed forces — including those who have not engaged in unlawful conduct — that the program is being administered as intended. In other words, the certification helps to assure military members that they will not be victims of false positive tests. It also assures commanders that they have an accurate understanding of the degree, if any, of controlled substance use (authorized and unauthorized) in their unit. And, of course, the document can serve as a basis to initiate administrative, disciplinary, or criminal proceedings against a servicemember and provide a forensieally sound basis for so doing.[8]
It is also noteworthy that the mission statement of the Navy Drug Screening Laboratory that created the Form DD 2624 at issue here includes a purpose distinct from the production of forensic evidence for prosecution. Indeed, the stated mission of the Navy Alcohol and Drug Abuse Prevention program under which the urinalysis testing is authorized, is to “support Fleet readiness by fighting alcohol abuse and drug use.”[9] Thus, it is clear that the laboratory has an alternate purpose for testing, documenting, and certifying laboratory reports. This readiness purpose is reflected in the Military Rules of Evidence (M.R.E.) as well.
With the possible exception of a probable cause urinalysis, most urine collections are considered inspections under M.R.E. 313. Under the rule, “[a]n ‘inspection’ is an examination of ... a unit ... as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit.” M.R.E. 313(b). It is unclear how one would assess the collection of M.R.E. 313(b) samples under the “primary purpose” test, including the test results documented on the DD 2624 in this case, because it has not been litigated and addressed. However, what is clear is that any documents and statements recording and validating the results of such an inspection, both positive and negative, would have as an alternate purpose, if not a primary purpose, the “military fitness, or good order and discipline of the unit.” This contrasts with the cover memorandum, which is a document generated after the results of an inspection became known, and after the decision to prosecute was taken for the sole purpose of presenting evidence at court-martial.
Further, the record in this ease suggests that the technicians conducting the lab testing would not necessarily anticipate the use of even positive results and their recording and validation of these results in criminal proceedings. Of course, questions were not posed to the witnesses at trial to explore this point of the Crawford analysis.[10] However, civilian senior chemist Marinari testified that of the one million samples tested in the Navy and Marine Corps that year, ninety-nine percent were negative, which suggests that approximately ten thousand were screened positive. Given that there were 2966 total cases tried by court-martial involving all offenses in the Navy and Marine Corps for that *311 year,[11] clearly not all positive urinalyses or their corresponding reports led to or were used at courts-martial. Indeed, it suggests that only a small percentage of such testing lead to courts-martial. In such a context, one would not expect a technician or lab supervisor to prepare a lab document with the assumption that it would be used for criminal prosecution. Moreover, the Army Health Promotion/Risk Reduction/'Suicide Prevention Report (2010) (2010 Report) confirms that a majority of positive test results do not go to criminal prosecution in the military.[12]
This is not to say that the primary purpose, sole purpose, or an alternate purpose behind the use of the laboratory results, laboratory certifications, or laboratory forms in this or any other case are, or are not, covered by Crawford. The point is that while there is yet room for litigation over the underlying nature of military urinalysis documents, there was no obvious and clear error in this case beyond the admission of the cover memorandum. The majority dismisses the existence of alternate purposes behind military drug testing by stating that the Government did not prove that there were any such purposes. However, this is a plain error case. Thus, the burden is on Appellant to demonstrate plain and obvious error not on the Government to demonstrate the lack of plain error. As to whether further Crawford error might lurk within the confines of additional urinalysis documents is a matter that has not been fully litigated before or after Bullcoming affected Crawford’s reach.[13] It is tempting to create clarity with a blanket rule that reaches beyond Crawford and Bullcoming. But the issues involved are too important and the impact is too significant to apply Crawford in a robotic manner without first fully litigating and exploring the nuances that the Supreme Court identified in Bullcoming, as well as the military context in which these issues are raised.
III. The Military Context Has Not Been Addressed
There is an additional problem in applying Crawford in a mechanical manner without further litigation: the Supreme Court’s *312 Crawford, cases do not address military-specific distinctions at all. That should be done by this Court, in the first instance. At least three significant distinctions are in play, in addition to those identified by Justice Soto-mayor. First, while the Supreme Court’s analysis adopts a primary purpose test, and perhaps an alternate purpose test, the Supreme Court’s discussion of alternative purposes is directed to medical or administrative purposes, but not a context where the alternate or primary purpose is military readiness. Whether that would or should change the analysis is not settled, and the issue has not been litigated or decided at any appellate level.
That also means that the Crawford cases do not address circumstances where there are potentially competing or countervailing constitutional principles found in Articles I and II. The constitutional issue in each of the Crawford cases is directed solely to the Confrontation Clause. Therefore, the question is open as to whether the analysis or interpretation might be different if, for example, additional constitutional authorities are implicated. If the President expressly authorized a urinalysis program for the purpose of military readiness, would that change the analysis? The question has not been litigated or addressed. To be clear, the issue is not whether the Confrontation Clause applies. It does. The question is how. However, if the analysis in the military context were that simple, we should simply cite the text of the Confrontation Clause and remand. Moreover, if it were that plain and obvious, then it should be clear which of the other underlying documents admitted constitute plain error.
Third, and least important, the practical impact of its ruling in Bullcoming was important enough to the Supreme Court that it was included in the Court’s majority opinion and dissent. Therefore, it should be fully litigated and addressed in the military context as well. For example, the majority and dissenting opinions in Bullcoming address the administrative impact of the decision on the ability of state authorities and state laboratories to comply with Crawford, including the potential distances a lab technician might have to travel. 131 S.Ct. at 2728 (Kennedy, J., dissenting). However, the opinion clearly is not intended to address the impact of Crawford on running a national and even worldwide military laboratory testing program. Thus, the Bullcoming Court did not contemplate the potential for travel to Afghanistan, Iraq, or such other worldwide locations where a court-martial might occur, or the potential operational consequences of compelling commanders to withdraw service-members from the field for courts-martial in the continental United States to avoid the difficulties of procuring extensive travel for a laboratory technician. Neither is it clear what the implications to military readiness, if any, will be if this Court applies Crawford as proposed by the majority. For example, will this Court’s application of Crawford cause the government to revise the checks and balances currently used to ensure the military’s urinalysis program is a reliable tool of military readiness and discipline by limiting or avoiding the use of certifications? Such issues should be explored as part of or parallel to any sweeping Crawford pronouncements.

Conclusion

Based on the foregoing reasons, I would not find plain error in this case with respect to any of the urinalysis documents other than the cover memorandum. I would not reach further. Given the importance of the Crawford line of cases in upholding an accused’s right to confrontation and given the importance of the urinalysis program to military readiness and not just discipline — in short, the larger importance of performing drug tests and ensuring them accuracy — such conclusions should await the full litigation of the issues identified above.
Whether the admission of the cover memorandum was harmless beyond a reasonable doubt is a question of prejudice that this Court is well situated to address. A remand on this point could be reasonable in light of the expertise of Courts of Criminal Appeals in assessing trial impact. However, in this uncertain and changing context, this Court should take the lead in addressing prejudice *313 in this case. It is this Court and perhaps ultimately the Supreme Court, and not the Courts of Criminal Appeals, that will determine which of the underlying documents, marks, and measurements are “testimonial” and what weight such testimony bears.

. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

. Among other things, the form records the accession numbers of up to twelve servicemembers, as well as a unit identification code and the batch number in which the specimen was tested, the substances tested for, and the result (negative or in the case of a positive, the drug involved, e.g., “cocaine"). The back of the form includes unit identification coding for the Army, Navy, Marine Corps, and Air Force as well as spaces for persons handling the batch to document their custody. It also includes in block H the following "certification”: "I certify that I am a laboratory official, that the laboratory results indicated on this form were correctly determined by the proper laboratory procedures, and they are correctly annotated.” In this case, the certifying official is R. Flowers, who did not testify at Appellant’s trial.

. U.S. Const, art. I, § 8, cl. 14.

. U.S. Const, amend. VI.

. We know that the First Amendment, U.S. Const, amend. I, may apply differently in the military context. Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). Most importantly, we know that the Fourth Amendment, U.S. Const, amend. IV, may apply differently in military context, including military readiness inspections. Comm. For G.I. Rights v. Callaway, 518 F.2d 466, 474 (D.C.Cir.1975). In Comm. For G.I. Rights, the United States Court of Appeals for the District of Columbia Circuit upheld the constitutionality of an "administrative search exception” to the Fourth Amendment with regard to random drug testing of military personnel, reasoning:
To strike the proper balance between legitimate military needs and individual liberties we must inquire whether “conditions peculiar to military life” dictate affording different treatment to activity arising in a military context.
Id. at 476 (citing Carlson v. Schlesinger, 511 F.2d 1327, 1331 (D.C.Cir.1975)). The court held that the state's strong public interest to ensure military readiness outweighs the privacy interests of servicemembers who already serve under considerably diminished Fourth Amendment rights. As the written statement, known as a circular, at issue in the case stated:
Search and seizure restrictions do not limit the commander’s authority to conduct inspections. An inspection does not presuppose a criminal offense and is not a search for evidence. It may be used for the purpose of examining the *308 clothing, equipment, and arms of a unit to determine its fitness and readiness to perform its mission, or to seek out contraband (e.g., illegal weapons, explosives, drugs).
Id. at 474-75.

. U.S. Const, amend. VI, cl. 3.

. As the Comm. For G.I. Rights court recounted:
[A] number of cases ... have recognized the differences between military and civilian life and the constitutional standards to be applied to each. See, e.g., Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); Secretary of the Navy v. Avrech, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974); Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); and Carlson v. Schlesinger, 511 F.2d 1327 (D.C.Cir.1975). While reaffirming the general principle that the members of the Armed Forces are entitled to constitutional protections, these cases stress that "the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside of it.”
518 F.2d at 474 (citing Parker v. Levy, 417 U.S. at 758, 94 S.Ct. 2547).

. The majority misapprehends the distinction between the majority and this dissent. The purpose of the drug testing is not determinative of the purpose behind any statements that may be testimonial that are contained in drug testing reports. However, the dissent believes that the purpose of the test may inform one’s judgment as to the purpose of any statement in the resulting report.

. Navy Alcohol and Drug Abuse Prevention (OP-NAV 135F), http://www.public.navy.mil/bupers-npc/support/nadap/Pages/default2.aspx (last visited August 29, 2011).

.Whether this is important or not depends on how one reads the Crawford terminology: "statements ... made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” 541 U.S. at 52, 124 S.Ct. 1354.

. Annual Report of the Code Committee on Military Justice 14 (2007), reprinted in 67 M.J. LXXI-II, CXXX (2008).

. The Medical Review Officer "clearance rate,” defined as "the percentage of excused positive tests” for warriors using prescription drugs in 2009 was 90%. 2010 Report at 44-45. Moreover, in 2009 there were 1,415 illicit drug use positives (excluding marijuana) not reported to law enforcement, and "considerfing] the fact that 25% of all investigated drug cases lead to multiple subjects, this number could be closer to 2,000 drug related subjects.” 2010 Report at 60.

. Justice Sotomayor’s second and third concurring caveats are also in play, but are not essential to the outcome of this case. Second, it is not clear after Bullcoming whether or not the testimony of Mr. Marinari as a lab supervisor is adequate under Crawford to satisfy the confrontation clause with respect to the underlying tests and materials. Justice Sotomayor’s concurrence does not answer this question, but puts it into play. “It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results.” 131 S.Ct. at 2722 (Sotomayor, J., concurring in part). Is Mr. Mari-nari such an official? Is he such an official for the purposes of Form DD 2624? These questions were not litigated at trial for the purposes of Bullcoming and the parties have not had the opportunity to make their arguments on this point.
Justice Sotomayor’s third caveat is implicated as well, though less directly. That is because this is a case where the expert witness was asked for his independent opinion about underlying testimonial reports; however, the underlying testimonial reports were themselves admitted into evidence. Thus, Bullcoming does not speak directly to this case on this point, but it can be read to suggest that where the reports themselves are admitted there may be a Crawford problem. In any event, Blazier II has already addressed the basic point: an expert witness may, pursuant to M.R.E. 703, offer an independent opinion about underlying testimonial reports. 69 M.J. at 224; see United States v. Johnson, 587 F.3d 625, 635 (4th Cir.2009) ("Crawford forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence"). The harder and more contextual question is whether the admission of such expert testimony can render harmless the admission of Crawford-triggering report testimony. Our cases have not been litigated at the appellate level with this issue in mind.