UNITED STATES, Appellee

v.

Joseph A. SWEENEY, Chief Legalman
United States Navy, Appellant

No. 10-0461

Crim. App. No. 200900468

United States Court of Appeals for the Armed Forces

Argued May 17, 2011

Decided August 30, 2011

RYAN, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN, J., joined. BAKER, J., filed a separate opinion concurring in part and dissenting in part, in which STUCKY, J., joined.


Counsel


For Appellant: Major Kirk Sripinyo, USMC (argued); Lieutenant Michael E. Maffei, JAGC, USN.


For Appellee: Lieutenant Ritesh K. Srivastava, JAGC, USN (argued); Colonel Louis J. Puleo, USMC, Lieutenant Commander Sergio F. Sarkany, JAGC, USN, and Brian K. Keller, Esq. (on brief).

Military Judge: David L. Bailey


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Sweeney, 10-0461/NA

Judge RYAN delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted by special court-martial of one specification of failure to go to his appointed place of duty, one specification of absence without leave, one specification of making a false official statement, and one specification of wrongful use of cocaine. Articles 86, 107, 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 907, 912a (2006). He was sentenced to confinement for thirty days and a bad-conduct discharge. The convening authority approved the adjudged findings and sentence, and the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed. United States v. Sweeney, No. NMCCA 200900468, slip op. at 4 (N-M. Ct. Crim. App. Apr. 29, 2010).

In the Blazier cases,[1] we set forth a straightforward path for analyzing the admissibility of drug testing reports under the Confrontation Clause. Prior to announcing our decision in Blazier II, we granted Appellant's petition for review as a Blazier trailer to determine whether Appellant was denied his right of confrontation under the Sixth Amendment.[2] Applying the

_____

[1] United States v. Blazier (Blazier II), 69 M.J. 218, 222 (C.A.A.F. 2010); United States v. Blazier (Blazier I), 68 M.J. 439 (C.A.A.F. 2010).
[2] On September 10, 2010, we granted the petition for review on two issues:

    I.    WHETHER, IN LIGHT OF THE UNITED STATES SUPREME COURT'S RULING IN MELENDEZ-DIAZ v. MASSACHUSETTS, 557 U.S. __,

2

principles we set forth in those cases as well as prior and subsequent Supreme Court precedent to the particular facts before us, we hold that Appellant was denied his right to confront the witnesses against him, and we remand to the court below for consideration of whether the error was harmless beyond a reasonable doubt.

---

129 S. CT. 2527 (2009), THE ADMISSION INTO EVIDENCE OF THE NAVY DRUG SCREENING LABORATORY URINALYSIS DOCUMENTS VIOLATED APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.

II.   WHETHER TRIAL DEFENSE COUNSEL'S OBJECTION TO THE DRUG LABORATORY REPORT CONSTITUTED A VALID CRAWFORD OBJECTION.  IF NOT, THEN WHETHER TRIAL DEFENSE COUNSEL WAIVED OR FORFEITED THE CONFRONTATION CLAUSE ISSUE, AND, IF FORFEITED, WHETHER ADMISSION OF THE REPORT CONSTITUTED PLAIN ERROR.

On February 23, 2011, we specified an additional issue:

WHETHER THE COURT OF CRIMINAL APPEALS ERRED AS A MATTER OF LAW IN DECLINING TO APPLY MELENDEZ-DIAZ v. MASSACHUSETTS, 129 S. CT. 2527 (2009), IN ASSERTING THAT UNITED STATES v. MAGYARI, 63 M.J. 123 (C.A.A.F. 2006), "FOUND DRUG LABORATORY REPORTS TO BE NON-TESTIMONIAL IN NATURE," AND IN HOLDING (1) THAT DRUG LABORATORY DOCUMENTS WERE NONTESTIMONIAL IN NATURE, (2) THAT THE LAB REPORT WAS A RECORD OF A REGULARLY CONDUCTED ACTIVITY OF THE NAVY DRUG SCREENING LABORATORY THAT QUALIFIED AS A BUSINESS RECORD AND FIRMLY ROOTED HEARSAY EXCEPTION UNDER M.R.E. 803(6), AND (3) THAT THERE WAS NOTHING TO SUGGEST THAT THE LAB REPORT WAS GENERATED FOR COURT-MARTIAL USE.  SEE UNITED STATES v. BLAZIER, 69 M.J. 218 (C.A.A.F. 2010); UNITED STATES v. BLAZIER, 68 M.J. 439 (C.A.A.F. 2010); AND UNITED STATES v. HARCROW, 66 M.J. 154 (C.A.A.F. 2008).

I.   BACKGROUND

A.   Facts

In February 2008, Appellant reported to the Navy Mobilization Processing Site (NMPS), Norfolk, after his unauthorized absence following his return from Iraq.  NMPS policy required any member returning from an unauthorized absence of twenty-four hours or more to submit to a urinalysis.  Thus, the Officer-in-Charge (OIC) ordered Appellant to provide a urine sample for testing, which Appellant did.[3]

The Navy Drug Screening Laboratory (NDSL) tested Appellant's sample.  According to the Government's expert witness, Mr. Albert Marinari, a NDSL employee, NDSL is a "forensic" laboratory whose "mission" is to "provid[e] urinalysis drug testing that is scientifically valid and forensically acceptable as evidence in courts of law," and which employs certain procedures "to ensure that the integrity of . . . the evidence has been . . . preserved."

---

[3] Although the drug testing report's specimen custody document indicates that the sample was submitted voluntarily, the military judge found, based on the OIC's testimony, that Appellant submitted the sample pursuant to the OIC's order.  The military judge made this finding in the course of ruling on Appellant's motion in limine to suppress the urinalysis results as the fruit of an unlawful search not justified by Military Rule of Evidence (M.R.E.) 313.  The military judge denied that motion.  Appellant has not appealed that ruling, and the issue is not before this Court.

NDSL determined that Appellant's sample was presumptively positive for cocaine and codeine in two immunoassay screen tests conducted on March 5, 2008.  Thereafter, NDSL conducted a gas chromatograph/mass spectrometry (GC/MS) confirmation test for cocaine on March 7 and another one for codeine on March 12.  All testing was complete by March 12.

NDSL's drug testing report includes chain of custody documents and machine-generated printouts of machine-generated data produced in the course of testing.  It also contains "data review" sheets for each test, signed by various officials on the date of the test.  The data review sheets for the cocaine and codeine GC/MS confirmation tests contain handwritten notations of the results.

In addition to these documents, the report includes a "specimen custody document" signed by laboratory official "R. Flowers" on March 13 stating that the sample arrived with the package and bottle seals intact, indicating that the sample tested positive for cocaine and codeine, and certifying (unlike a typical chain of custody document) additional substantive information:  that the "laboratory results indicated on this form were correctly determined by proper laboratory procedures, and they are correctly annotated."  Finally, the report includes a cover memorandum addressed to the Region Legal Service Office (RLSO) signed by Robert Sroka by direction, certifying that the

immunoassay screens and GC/MS confirmation tests detected cocaine metabolites and opiate compounds in excess of Department of Defense (DOD) cutoffs. The cover memorandum is dated September 26 -- three weeks after Appellant was charged.[4]

Appellant's special court-martial began on November 3, 2008, and ended on May 6, 2009.[5] The Government sought to pre-admit the entire drug testing report (PE 13), as well as an unsigned "report summary" (PE 17) indicating that Appellant's sample tested positive for cocaine and codeine. Defense counsel objected to pre-admitting the documents, citing "proper foundation" and "chain of custody." Although the military judge commented that there would be "a Crawford objection" if the Government failed to call the "critical witnesses" and "lay the foundation for the documents," defense counsel continued to focus on "foundation" and did not argue that any of the documents were testimonial. The military judge pre-admitted the documents subject to the Government "carrying out its obligations."

---

[4] Although Appellant initially was charged with wrongful use of both cocaine and codeine, the specification relating to codeine was subsequently dismissed. This appeal concerns only the specification charging wrongful use of cocaine.

[5] The Supreme Court would not decide Melendez-Diaz until more than a month later, on June 25, 2009. And this Court would not decide the Blazier cases until 2010. At the time of trial, the Supreme Court had decided Crawford v. Washington, 541 U.S. 36 (2004), and this Court had decided Magyari and Harcrow.

In an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2006), session, defense counsel objected to admission of "the lab things," specifically naming a bottle and arguing that "under Crawford the individual that actually handled the bottle and had a piece in the process needs to be here too." When the military judge asked why the bottle was "testimonial," defense counsel began by stating, "it's the urinalysis in general, sir, all of the documents, sir." The military judge then focused defense counsel's attention on the bottle. Defense counsel argued that the individual who signed the bottle label was providing testimony that that individual handled the bottle correctly. After the military judge rejected this argument and admitted the bottle,[6] defense counsel stated that he had no further issues he wished to raise.

During the trial, the Government did not call either Flowers or Sroka as witnesses but instead called Mr. Marinari as an expert in forensic chemistry urinalysis testing and interpretation. Although Mr. Marinari signed both the cocaine confirmation test data review sheet as the "final lab certifying official" (FLCO)[7] and one of the chain of custody documents, he

---

[6] Appellant has not appealed this ruling and does not argue that this colloquy constituted a Crawford objection to the drug testing report or report summary.

[7] According to Mr. Marinari, his role as FLCO did not involve participation in or observation of the testing, but simply involved certifying the results of the GC/MS cocaine test after

did not sign either the cover memorandum or the specimen custody document.  Moreover, he testified that he did not perform any of the tests and was "not present when . . . any of the technicians did any of . . . their work," including the collection, shipping, packaging, inspecting, or testing of the sample.  When the Government sought to have Mr. Marinari discuss the NDSL drug testing report and publish it to the members, defense counsel again objected citing the "proper foundation" and "chain of custody" of the bottle.  The military judge again overruled the objection, and defense counsel agreed that there was no issue with respect to the drug testing report.  The military judge permitted the report to be introduced in its entirety.

Mr. Marinari then testified as to the contents of the drug testing report.  At various points in his direct examination, he testified that the report showed the presence of cocaine and codeine, at one point referencing the specimen custody document, and later referencing a machine-generated printout.  Although he presented his opinions as his own, the Government introduced the entire drug testing report into evidence.  On cross-examination, defense counsel sought to impeach the reliability of the tests.

---

reviewing "all the chain of custody documents, and all the test data" and determining that the test "met all requirements established by DOD."

B. NMCCA Decision

The NMCCA found no error in the admission of the laboratory documents.[8] Sweeney, No. NMCCA 200900468, slip op. at 3. The court relied entirely upon Magyari, which it characterized as holding that "drug laboratory documents [are] non-testimonial in nature." Id. The court also found that, unlike the cover memorandum that this Court had by then deemed testimonial in Blazier I, "there is nothing to suggest that the lab report [here] was generated for court-martial use." Id. at 3 n.1. Finally, the court applied the indicia of reliability test set forth in Ohio v. Roberts, 448 U.S. 56, 65-66 (1980), and concluded that the entire report was admissible pursuant to the "firmly rooted hearsay exception" for "business record[s]." Sweeney, No. NMCCA 200900468, slip op. at 3.

II. LAW

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.[9] Accordingly, testimonial hearsay may not

---

[8] Despite finding that Appellant "waive[d]" his objection to the laboratory documents, Sweeney, No. NMCCA 200900468, slip op. at 3 (citing Rule for Courts-Martial (R.C.M.) 905(e), Manual for Courts-Martial, United States (2008 ed.) (MCM)), the court nonetheless analyzed whether the admission of those documents was erroneous and did not apply the plain error test.
[9] The "text of the Sixth Amendment" does not contain exceptions for the military. But see United States v. Sweeney, __ M.J. __ (3) (C.A.A.F. 2011) (Baker, J., dissenting). And our case law has more than once applied the Confrontation Clause to documents

9

come into evidence without cross-examination of the declarant unless (1) the declarant is unavailable, and (2) the declarant was subject to prior cross-examination on the hearsay. Blazier II, 69 M.J. at 222; see also Bullcoming v. New Mexico, 131 S. Ct. 2705, 2710 (2011) ("The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist."); accord Cavitt, 69 M.J. at 414; United States v. Dollar, 69 M.J. 411, 412 (C.A.A.F. 2011).

Although "reasonable minds may disagree about what constitutes testimonial hearsay," Blazier II, 69 M.J. at 222, a statement is testimonial if "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Blazier I, 68 M.J. at 442 (quoting Crawford, 541 U.S. at 51-52) (quotation marks omitted). Thus, "[a] document created solely

---

generated in the military urinalysis program. See United States v. Cavitt, 69 M.J. 413, 413 (C.A.A.F. 2011); Blazier II, 69 M.J. at 222. This case does not involve a statute, presidential rule, or judicial decision purporting to diminish the protections afforded by the Confrontation Clause in the military urinalysis context; nor has the Government attempted to demonstrate a military exigency requiring diminished protection. See, e.g., United States v. Jacoby, 11 C.M.A. 428, 433, 29 C.M.R. 244, 249 (1960). Accordingly, we have no cause in this case to depart from Blazier II, in which we applied the Confrontation Clause according to the usual principles established by Supreme Court precedent.

for an evidentiary purpose . . . made in aid of a police investigation, ranks as testimonial." Bullcoming, 131 S. Ct. at 2717 (quotation marks and citation omitted). We have held that testimonial statements include a formalized certification of results contained in a drug testing report requested by the prosecutor. Blazier I, 68 M.J. at 443; see also Bullcoming, 131 S. Ct. at 2717; Melendez-Diaz, 129 S. Ct. at 2532. In Blazier II, we further observed that it "is well-settled that under both the Confrontation Clause and the rules of evidence, machine-generated data and printouts are not statements and thus not hearsay -- machines are not declarants -- and such data is therefore not 'testimonial.'" Blazier II, 69 M.J. at 224; cf. Bullcoming, 131 S. Ct. at 2714 (noting that the "representations" contained in the testimonial statement at issue were "not revealed in raw, machine-produced data"). However, admission of and expert testimony about such documents, graphs, and charts may nevertheless implicate the rules of evidence. Blazier II, 69 M.J. at 224 ("Because machine-generated printouts of machine-generated data are not hearsay, expert witnesses may rely on them, subject only to the rules of evidence generally, and M.R.E. 702 and M.R.E. 703 in particular.").

What we have not previously decided is what precisely remains of Magyari after Melendez-Diaz, Blazier I, Blazier II,

11

and Bullcoming.  Answering that question here makes resolution of this case relatively straightforward.

### III.  APPLICABILITY OF MAGYARI

At the time of Appellant's trial, the leading case applying Crawford to the admission of drug testing reports within the military justice system was Magyari because Melendez-Diaz, Bullcoming, Blazier I, and Blazier II had not yet been decided. Handicapped by the Supreme Court's failure to give clear guidance as to how to determine whether hearsay was testimonial, see Crawford, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"), Magyari held that a drug testing report was nontestimonial in toto if those conducting the tests "were not engaged in a law enforcement function, a search for evidence in anticipation of prosecution or trial" and were "merely cataloguing the results of routine tests."  Magyari, 63 M.J. at 126-27.  Magyari concluded that drug tests initiated by a unit sweep are nontestimonial because "[t]here [was] no indication that any of [the laboratory technicians] had reason, or were under pressure, to reach a particular conclusion about [the accused's] sample . . . or that they had reason to distinguish [the accused's sample] from the other thousands of samples routinely screened and tested by batch at the laboratory."  Id. at 127.  Conversely, drug testing reports were testimonial

"where the testing [was] initiated by the prosecution to discover incriminating evidence." Id. (emphasis added); see also Harcrow, 66 M.J. at 159 (holding that where the testing was initiated by the prosecution to discover incriminating evidence, the laboratory documents were testimonial). As a result, even after Melendez-Diaz, Blazier I, and Blazier II, the Courts of Criminal Appeals have continued to cite Magyari without further analysis as the basis for finding no error in the admission of all portions of a drug test report except the cover memorandum where the impetus behind the initial urinalysis was unit inspection, rather than law enforcement.[10]

But decisions of this Court and the Supreme Court since Magyari dictate that further analysis is required. First, it is emphatically not the case that a statement is automatically nontestimonial by virtue of it being a "routine" statement of

---

[10] See, e.g., United States v. Lusk, No. ACM S31624, 2010 CCA LEXIS 367, at *7-*8, 2010 WL 4068922, at *3 (A.F. Ct. Crim. App. Oct. 14, 2010); United States v. Dunn, No. ACM S31584, 2010 CCA LEXIS 169, at *27, 2010 WL 3981682, at *9 (A.F. Ct. Crim. App. Aug. 31, 2010); United States v. Weeks, No. ACM S31625, 2010 CCA LEXIS 193, at *6-*7, 2010 WL 4069035, at *3 (A.F. Ct. Crim. App. July 26, 2010); United States v. Burton, No. ACM S31632, slip. op. at 4 (A.F. Ct. Crim. App. June 18, 2010); United States v. Stewart, No. ACM S31685, 2010 CCA LEXIS 255, at *8-*9, 2010 WL 4068947, at *3 (A.F. Ct. Crim. App. June 8, 2010); United States v. Nutt, No. ACM S31600, 2010 CCA LEXIS 198, at *11, 2010 WL 2265272, at *4 (A.F. Ct. Crim. App. May 6, 2010); United States v. Robinson, No. NMCCA 200800827, 2010 CCA LEXIS 8, at *10-*12, 2010 WL 31686, at *4 (N-M. Ct. Crim. App. Jan. 28, 2010); United States v. Skrede, No. 2009-09, 2009 CCA LEXIS 443, at *6 (A.F. Ct. Crim. App. Nov. 23, 2009).

"unambiguous factual matters."[11]  Magyari, 63 M.J. at 126

(citations omitted).  Indeed, "[m]ost witnesses . . . testify to

their observations of factual conditions or events, e.g., 'the

light was green,' 'the hour was noon.'"  Bullcoming, 131 S. Ct.

at 2714.  But this does not render such observations

nontestimonial.[12]  Id. at 10-11.  But see Magyari, 63 M.J. at

126-27; Brief of Appellee at 20-24, United States v. Sweeney,

No. 10-0461 (C.A.A.F. Nov. 23, 2010).

Second, Magyari and the dissent notwithstanding, see

Sweeney, __ M.J. at __ (9-11) (Baker, J., dissenting), more

recent case law demonstrates that the focus has to be on the

purpose of the statements in the drug testing report itself,

rather than the initial purpose for the urine being collected

and sent to the laboratory for testing.  The relevant question

---

[11] Magyari's reasoning to the contrary relied, like the Supreme
Judicial Court of Massachusetts in Melendez-Diaz, upon
Commonwealth v. Verde, 827 N.E.2d 701 (Mass. 2005).  The Supreme
Court has specifically rejected Verde's reasoning.  See
Melendez-Diaz, 129 S. Ct. at 2532.

[12] That a statement is "routine" is relevant only to whether that
statement is made in the "ordinary course of business" -- which
of course does not determine whether the statement is
testimonial.  Blazier II, 69 M.J. at 226 n.8 (citing Melendez-
Diaz, 129 S. Ct. at 2538-40).  Moreover, that "factual matters"
may be "unambiguous" means only that a declarant need not be
competent to perceive them; it does not mean the declarant was
honest in reporting them -- an equal concern of the
Confrontation Clause.  See Bullcoming, 131 S. Ct. at 2715
(noting that the purpose of cross-examining the declarant is to
probe "incompetence, evasiveness, or dishonesty") (emphasis
added); Melendez-Diaz, 129 S. Ct. at 2537 (noting that the
purpose of confrontation is to probe the witness's competence
and honesty).

14

is thus whether the statement is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Blazier I, 68 M.J. at 442 (quoting Crawford, 541 U.S. at 51-52) (quotation marks omitted). Asked another way, would it be reasonably foreseeable to an objective person that the purpose of any individual statement in a drug testing report is evidentiary? See Blazier I, 68 M.J. at 442 (noting that "fine distinctions based on the impetus behind the testing and the knowledge of those conducting laboratory tests" are "relevant" but not dispositive in determining whether the purpose of a "statement" is evidentiary).

Although those performing initial drug tests may well be "independent scientist[s]" carrying out "non-adversarial public dut[ies]," that does not mean that their statements are not produced to serve as evidence. See Bullcoming, 131 S. Ct. at 2717 (quotation marks and citation omitted); Melendez-Diaz, 129 S. Ct. at 2536-37. Where, as here, an accused's sample tests positive in at least one screening test, analysts must reasonably understand themselves to be assisting in the production of evidence when they perform re-screens and confirmation tests and subsequently make formal certifications[13]

---

[13] As reflected in Bullcoming, the formality of a document generated by a forensic laboratory is a factor to be considered

on official forms attesting to the presence of illegal substances, to the proper conducting of the tests, and to other relevant information.[14]  This is all the more evident where, as here, the Government expert testifies that the forensic laboratory's "mission" is to "provid[e] urinalysis drug testing that is scientifically valid and forensically acceptable as evidence in courts of law."[15]

---

when determining whether a document is testimonial.  See Bullcoming, 131 S. Ct. at 2717 (holding that "the formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the witness's] assertions as testimonial"); see also Melendez-Diaz, 129 S. Ct. at 2543 (Thomas, J., concurring) ("I continue to adhere to my position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" (quoting White v. Illinois, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in the judgment))).

[14] Here, for example, the initial screen and re-screen tests were conducted on March 5, prompting a confirmation test for cocaine on March 7.  Both the cover memorandum and specimen custody document were completed and signed after all testing was completed.

[15] The fact that a commander, as a matter of command prerogative, may forgo court-martial proceedings against an alleged wrongdoer and instead impose nonjudicial punishment, see, e.g., Article 15(b), UCMJ, 10 U.S.C. § 815(b) (2006) (granting the commanding officer the discretion to "impose one or more . . . disciplinary punishments for minor offenses without the intervention of a court-martial"), cannot change the reality that the document was, on its face, created to serve as evidence.  A different case might arise if the prosecution offers evidence at trial that raises an issue as to whether a particular document was not created to serve as evidence.  Given the posture of this case, where the defense did not object to the admission of the documents on Confrontation Clause grounds, no such issue was raised or developed in this case.

In short, recent case law from this Court and the Supreme Court requires an examination of individual statements that goes beyond Magyari.  We now turn to that examination.

### IV.  PLAIN ERROR

In light of the above, and for the reasons set forth below, we hold that Appellant's failure to object to the admission of the NDSL drug testing report on Confrontation Clause grounds was forfeited rather than waived in light of Magyari.  In addition, we hold that testimonial hearsay was erroneously admitted; that the testimony of Mr. Marinari (who was not the declarant of the testimonial hearsay) did not satisfy the Confrontation Clause; and that these errors were plain and obvious.  We remand to the Navy-Marine Corps Court of Criminal Appeals to determine whether these plain and obvious errors were harmless beyond a reasonable doubt.

A.    Waiver/Forfeiture[16]

"Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" United States v. Olano, 507 U.S. 725, 732 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)); see also Harcrow, 66 M.J. at 156. "[T]here is a presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly established that there was an intentional relinquishment of a known right or privilege." Harcrow, 66 M.J. at 157 (quotation marks and citation omitted).  To determine whether a failure to object was waiver or mere forfeiture, we look to the state of the law at the time of trial, and we will not find waiver where subsequent case law "opened the door for a colorable assertion of the right

---

[16] On appeal, Appellant challenges the testimony of Mr. Marinari and the admission of the drug testing report and results report summary as violating his right of confrontation.  Brief of Appellant at 9, United States v. Sweeney, No. 10-0461 (C.A.A.F. Oct. 8, 2010).  To challenge evidence, an accused must "stat[e] the specific ground of objection, if the specific ground was not apparent from the context."  M.R.E. 103(a)(1).  At trial, Appellant did not object to the documents on Confrontation Clause grounds.  Instead, as described above, all of Appellant's objections were either that the documents lacked proper "foundation" or that a laboratory bottle not at issue here was testimonial.  None of these objections was to the laboratory documents on Confrontation Clause grounds.  See United States v. Mashek, 606 F.3d 922, 929-30 (8th Cir. 2010) (applying plain error review where the accused had not raised a Confrontation Clause objection although the judge had admitted evidence subject to the prosecution establishing proper foundation).

to confrontation where it was not previously available." Id. at 157-58.

At the time of Appellant's trial, he had no "colorable objection" and therefore did not voluntarily relinquish a "known" right of confrontation. Because Appellant's urinalysis, like the urinalysis testing in Magyari, was not initiated at the outset by law enforcement, any objection by Appellant would have been overruled under Magyari -- as evidenced by the continued use of Magyari in the Courts of Criminal Appeals as the basis for finding no error in the admission of such tests, even in the aftermath of Melendez-Diaz, Blazier I, and Blazier II. See supra note 10. And, tellingly, the CCAs have relied on Magyari as the basis for reversing trial court judges who refused to admit drug testing reports without the testimony of the declarants of testimonial hearsay. See, e.g., Skrede, 2009 CCA LEXIS 443, at *6. Failing to make what would have been a meritless objection under Magyari's interpretation of Crawford cannot possibly signal either a strategic trial decision or a voluntary relinquishment of a "known" right, see Harcrow, 66 M.J. at 158, in the context of the military justice system. We therefore review for plain error.

## B. Plain Error

Under plain error review, this Court will grant relief only where (1) there was error, (2) the error was plain and obvious,

19

and (3) the error materially prejudiced a substantial right of the accused. Id. Where, as here, the alleged error is constitutional, the prejudice prong is fulfilled where the Government cannot show that the error was harmless beyond a reasonable doubt. Id. at 160.

We find plain and obvious error in the admission of two statements from the NDSL report. First, it was plain and obvious error to admit the cover memorandum results certification. The laboratory made the memorandum after Appellant had been charged, addressed it to the RLSO, and included the formulaic language for authenticating a business record -- language one would expect to find only on a document made for an evidentiary purpose. In all material respects, this formal, affidavit-like certification of results resembles those we found testimonial in Blazier I, and the declarant, Robert Sroka, was not subject to cross-examination. See Bullcoming, 131 S. Ct. at 2715-17 (finding error in admitting a formalized certification of results through a surrogate witness without confrontation of the declarant); Blazier II, 69 M.J. at 223-24 (finding error in admitting the Blazier I cover memoranda through a surrogate witness and without confrontation of the declarant).

Second, it was also plain and obvious error to admit the specimen custody document certification. This certification is

20

a formal, affidavit-like statement of evidence that not only presented the machine-generated results, but also indicated "that the laboratory results . . . were correctly determined by proper laboratory procedures, and that they are correctly annotated."  See Bullcoming, 131 S. Ct. at 2715 (holding that the out-of-court declarant "certified to more than a machine-generated number" when the statements included affirmations regarding accuracy and compliance with laboratory protocol). Such a formal certification has no purpose but to function as an affidavit.  Because the declarant, "R. Flowers," was not subject to cross-examination, admission of the specimen custody document plainly and obviously violated the Confrontation Clause. Furthermore, this violation was compounded when Mr. Marinari testified that the specimen custody document showed the presence of cocaine and codeine.  See Blazier II, 69 M.J. at 226 (finding a violation of the Confrontation Clause where an expert witness repeated the substance of testimonial hearsay).[17]

---

[17] Contrary to the dissent, this case does not involve any of the circumstances Justice Sotomayor mentioned in Bullcoming.  First, "this is not a case in which the State suggested an alternate purpose, much less an alternate primary purpose, for the [specimen custody document]."  See Bullcoming, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part) (emphasis in original). Although military readiness may be an "alternate purpose" of the testing, Mr. Marinari's testimony makes clear that the formal, affidavit-like certification on the specimen custody document itself was made for an evidentiary purpose and not, as the dissent claims, to "assure[] commanders as well as members of the Armed Forces -- including those who have not engaged in

In finding that no testimonial hearsay was admitted, the NMCCA made several errors.  First, the court cited Magyari for the proposition that all drug testing reports are nontestimonial.  Sweeney, No. NMCCA 200900468, slip op. at 3.  Second, in considering the admissibility of the drug testing report, the court overlooked the fact that while no request specified that the cover memorandum be made "for court-martial use," the memorandum was requested by the RLSO after testing was complete, thus rendering the purpose for the memorandum facially evidentiary.  See id. at 3 n.1.  Third, it considered the drug testing report in toto without examining the admissibility of particular statements within the report.  Finally, the court's

---

unlawful conduct -- that the program is being administered as intended" or to "assure[] commanders that they have an accurate understanding of the degree, if any, of controlled substance use (authorized and unauthorized) in their unit."  Sweeney, __ M.J. at __ (10) (Baker, J., dissenting).  As noted supra note 15, it could be a different case had the Government presented any evidence of an alternate purpose of the documents at issue. Second, as described supra, Mr. Marinari testified that he was not present for any stage of the testing; he is therefore not "a supervisor who observed an analyst conducting a test [and who] testified about the results or a report about such results." See Bullcoming, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part).  Third, "this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence."  See id. (Sotomayor, J., concurring in part).  The specimen custody document was admitted into evidence.  Finally, as the dissent acknowledges, "this is not a case in which the [Government] introduced only machine-generated results, such as a printout from a gas chromatograph."  See id. (Sotomayor, J., concurring in part).  Bullcoming commands our decision in this case; it does not undermine it.

reliance on Roberts and "firmly rooted hearsay exception[s]" to assess the admissibly of the report in light of the requirements of the Confrontation Clause is obsolete. Cavitt, 69 M.J. at 414. Once these errors are corrected, it is plain and obvious that the cover memorandum and specimen custody document are testimonial.

However, we do not find that the stamps, signatures, and other notations on the chain of custody documents and data review sheets, or the results report summary are "plainly and obviously" testimonial in the context of review for plain error. Although we are concerned in particular about the admission of the cocaine confirm data review sheet and results report summary -- both of which summarize test results -- these documents are not "plainly and obviously" testimonial as they are neither formalized, affidavit-like statements, see, e.g., Bullcoming, 131 S. Ct. at 2717; Melendez-Diaz, 129 S. Ct. at 2532; Blazier I, 68 M.J. at 443, nor statements made in a formal setting, see, e.g., Hammon v. Indiana, 547 U.S. 813, 830 (2006) (holding that statements made during a police interrogation which took place in a formal setting rendered the statements "inherently testimonial").[18] Moreover, assuming arguendo these two documents

---

[18] While formality may not be the exclusive means of deciding whether a statement is testimonial, but see Michigan v. Bryant, 131 S. Ct. 1143, 1167 (2011) (Thomas, J., concurring), the informal stamps, signatures, notations, and numbers are not so

were testimonial, the error still would not be "plain and obvious": one of the declarants of the data review sheet was Mr. Marinari himself, who testified. And because the results report summary does not name a declarant and was not discussed at trial, it is by no means plain and obvious that its declarant did not testify.

An objection at trial, followed by more extensive development of the evidence and argument on its nature, might tip the balance the other way in an appropriate case. On this point, we agree with the dissent that "there is yet room for litigation over the underlying nature of military urinalysis documents." Sweeney, __ M.J. at __ (14) (Baker, J., dissenting). Here, however, there was no objection, and the admission of the chain of custody documents, data review sheets, and results report summary did not constitute plain error.

## C. Prejudice

We grant relief for Confrontation Clause errors only where they are not harmless beyond a reasonable doubt. Delaware v. Van Arsdale, 475 U.S. 673, 684 (1986). Among other factors, we consider the importance of the unconfronted testimony in the prosecution's case, whether that testimony was cumulative, the

---

clearly testimonial as to meet the heightened "plain and obvious" standard applied on plain error review.

existence of corroborating evidence, the extent of confrontation permitted, and the strength of the prosecution's case.  Id.

We explained the harmless error inquiry in the context of the erroneous admission of testimonial hearsay in Blazier II:

> [The expert witness] could have arrived at an expert opinion based on training, education, experience and admissible evidence alone, and considered, but not repeated, inadmissible evidence in arriving at an independent expert opinion.  Such expert opinion and admissible evidence together could have been legally sufficient to establish the presence of drug metabolite in the urine tested.  See United States v. Barrow, 45 M.J. 478, 479 (C.A.A.F. 1997).  But in assessing harmlessness in the constitutional context, the question is not whether the evidence was legally sufficient to uphold a conviction without the erroneously admitted evidence.  See Fahy v. Connecticut, 375 U.S. 85, 86 (1963).  Rather, "'[t]he question is whether there is a reasonable probability that the evidence complained of might have contributed the conviction.'"  Chapman [v. California], 386 U.S. [18], 23 (quoting Fahy, 375 U.S. 86-87).  This determination is made on the basis of the entire record, and its resolution will vary depending on the facts and particulars of the individual case.

Blazier II, 69 M.J. at 226-27.  Here, as in Blazier II, the expert witness's independent opinion combined with the admissible machine-generated printouts could have provided legally sufficient evidence to convict Appellant under Barrow and Jackson v. Virginia, 443 U.S. 307 (1979).  However, we remand to the Court of Criminal Appeals to determine the altogether different question whether the inadmissible succinct summaries and expert's repetition of inadmissible hearsay were harmless beyond a reasonable doubt.

25

V.   CONCLUSION

Because the cover memorandum and specimen custody document contained in the NDSL report were plainly and obviously testimonial, the decision below is reversed, and the case is remanded to the United States Navy-Marine Corps Court of Criminal Appeals for consideration of whether the erroneous admission of testimonial hearsay was harmless beyond a reasonable doubt.

United States v. Sweeney, No. 10-0461/NA

BAKER, Judge, joined by STUCKY, Judge (concurring in part and dissenting in part):

INTRODUCTION

The majority reaches two conclusions.  First, it concludes that it was plain and obvious error to admit the cover memorandum reporting the results of the urinalysis.  United States v. Sweeney, __ M.J. __ (20) (C.A.A.F. 2011).  This conclusion is supported by the holding in United States v. Blazier (Blazier II), 69 M.J. 218 (C.A.A.F. 2010), with which I concur.  A cover memo drafted specifically for use at a court-martial reporting urinalysis test results is testimonial and falls squarely within the Supreme Court's Crawford v. Washington[1] line of cases.

Second, the majority concludes that it was also plain error to admit the specimen custody document certification, also known as Department of Defense (DD) Form 2624.  Sweeney, __ M.J. __ at (20).  This is the Department of Defense's basic chain of custody form for running its urinalysis program, for purposes of military readiness as well as for purposes of military justice.[2]

_____

[1] 541 U.S. 36 (2004).

[2] Among other things, the form records the accession numbers of up to twelve servicemembers, as well as a unit identification code and the batch number in which the specimen was tested, the substances tested for, and the result (negative or in the case of a positive, the drug involved, e.g., "cocaine").  The back of the form includes unit identification coding for the Army, Navy,

United States v. Sweeney, No. 10-0461/NA

I would not find plain error with respect to the admission of this document or any other urinalysis documents.

As discussed below, Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011), delimits the reach of Crawford, as did Davis v. Washington, 547 U.S. 813 (2006), before. Among other things, Bullcoming requires lower courts to consider the primary purpose behind documents, and the statements therein, at the time they were created. 131 S. Ct. at 2717. Justice Sotomayor's decisive concurring vote also suggests that an alternate purpose for creating the document and the statements therein may change the analysis as well. Id. at 2720. (Sotomayor, J., concurring in part).

What the primary purpose was for filling out the DD 2624 at issue in this case at the time it was filled out, as well as the statements it contains if any, has not been litigated but can only be inferred at this point. However, clearly, there was an alternate purpose to the urinalysis document at issue in this case as well as the information it contained. This is manifest in Department of Defense regulations. It is manifest in the

_____

Marine Corps, and Air Force as well as spaces for persons handling the batch to document their custody. It also includes in block H the following "certification": "I certify that I am a laboratory official, that the laboratory results indicated on this form were correctly determined by the proper laboratory procedures, and they are correctly annotated." In this case, the certifying official is R. Flowers, who did not testify at Appellant's trial.

2

mission statement of the testing laboratory.  And it is manifest

from the testimony at trial.  To the extent that the Supreme

Court's guidance is clear as to how it would apply in a military

context, it is clear only with respect to the cover memorandum

expressly prepared for trial as in Blazier II and in this case.

As a separate matter, neither Bullcoming nor any other of the

Supreme Court's Crawford cases addresses the distinct and

specific constitutional questions raised in the context of a

military urinalysis program addressed to military readiness as

well as military justice.  Nor do these cases address the

possible implications of other constitutional principles that

might impact the analysis, including the President's authority

as Commander-in-Chief, Congress's "Rules and Regulations"

authority under Article I of the United States Constitution,[3] and

exceptions contained within the text of the Sixth Amendment[4]

applied to members of the armed forces.[5]  Whether the

---

[3] U.S. Const. art I, § 8, cl. 14.

[4] U.S. Const. amend. VI.

[5] We know that the First Amendment, U.S. Const. amend I, may apply differently in the military context.  Parker v. Levy, 417 U.S. 733 (1974).  Most importantly, we know that the Fourth Amendment, U.S. Const. amend. IV, may apply differently in military context, including military readiness inspections. Comm. For G. I. Rights v. Callaway, 518 F.2d 466, 474 (D.C. Cir. 1975).  In Comm. For G. I. Rights, the United States Court of Appeals for the District of Columbia Circuit upheld the constitutionality of an "administrative search exception" to the

constitutional rights of military persons will be implicated in the same ways as civilians in the context of the Confrontation Clause[6] and urinalysis has not been litigated or addressed by the Supreme Court or this Court.[7]  At a minimum, before this area of

---

Fourth Amendment with regard to random drug testing of military personnel, reasoning:

> To strike the proper balance between legitimate military needs and individual liberties we must inquire whether "conditions peculiar to military life" dictate affording different treatment to activity arising in a military context.

Id. at 476 (citing Carlson v. Schlesinger, 511 F.2d 1327, 1331 (D.C. Cir. 1975)).  The court held that the state's strong public interest to ensure military readiness outweighs the privacy interests of servicemembers who already serve under considerably diminished Fourth Amendment rights.  As the written statement, known as a circular, at issue in the case stated:

> Search and seizure restrictions do not limit the commander's authority to conduct inspections.  An inspection does not presuppose a criminal offense and is not a search for evidence.  It may be used for the purpose of examining the clothing, equipment, and arms of a unit to determine its fitness and readiness to perform its mission, or to seek out contraband (e.g., illegal weapons, explosives, drugs).

Id. at 474-75.

[6] U.S. Const. amend. VI, cl. 3.

[7] As the Comm. For G. I. Rights court recounted:

> [A] number of cases . . . have recognized the differences between military and civilian life and the constitutional standards to be applied to each.  See, e.g., Parker v. Levy, 417 U.S. 733, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974); Secretary of the Navy v. Avrech, 418 U.S. 676, 94 S. Ct. 3039, 41 L. Ed. 2d 1033 (1974); Schlesinger v. Councilman, 420 U.S. 738, 95 S.

4

law is set, the issues should be fully litigated and adjudicated at the appellate level before this Court.  Contrary to the majority view, the issue that divides the majority and the dissent is not whether the confrontation clause applies but how.

Until these issues are addressed, this Court should interpret Crawford and Bullcoming with a high degree of contextual caution.  Moreover, without addressing these questions it is not clear how we can find plain error in the admission of urinalysis documents that are generated not for a specific trial, but as part of the military's worldwide urinalysis program.  Nevertheless, it appears unlikely that the drug testing report, other than the cover memorandum, is testimonial under Supreme Court precedent, especially given the circumstances of this case.

---

Ct. 1300, 43 L. Ed. 2d 591 (1975); and Carlson v. Schlesinger, 511 F.2d 1327 (1975).  While reaffirming the general principle that the members of the Armed Forces are entitled to constitutional protections, these cases stress that "the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside of it."

518 F.2d at 474 (citing Parker v. Levy, 417 U.S. at 758).

DISCUSSION

I.  From Crawford to Bullcoming

In Crawford, 541 U.S. at 61, the Supreme Court held that the Sixth Amendment's Confrontation Clause is not a guarantee of "amorphous notions of 'reliability.'"  It is not a substantive but a procedural right to "testing in the crucible of cross-examination" before admitting prior testimonial statements of witnesses who are unavailable at trial.  Id.  Further, the Court held that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class."  Id. at 53; see Davis, 547 U.S. at 823.

In Melendez-Diaz v. Massachusetts, the Supreme Court held that the Confrontation Clause required more than unsupplemented "affidavits," and a witness must testify where the documents were "made for the purpose of establishing or proving some fact . . . [and were] functionally identical to live, in-court testimony."  129 S. Ct. 2527, 2532 (2009).

The Court subsequently refined and to a certain extent delimited Crawford.  In Davis, for example, the Court introduced a "primary purpose" test holding that a 911 call was not testimonial because the statements were "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable

police assistance to meet an ongoing emergency." 547 U.S. at 822. On the other hand, where the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," the statements are testimonial. Id. In Michigan v. Bryant, the Court applied the primary purpose test to hold admissible the statements of a man who had been shot, under an "ongoing emergency" primary purpose test:

> Because the circumstances of the encounter as well as the statements and actions of [the declarant] and the police objectively indicate that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, [the declarant's] identification and description of the shooter and the location of the shooting were not testimonial hearsay.

131 S. Ct. 1143, 1166-67 (2011) (citation and quotation marks omitted).

Finally, in Bullcoming, the Court addressed a blood analysis report from the Scientific Laboratory Division of the New Mexico Department of Health -- a report created specifically and exclusively for a criminal trial in New Mexico. 131 S. Ct. at 2710. In that context, the majority concluded that the Confrontation Clause did not permit "the prosecution to introduce a forensic laboratory report containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test

7

reported in the certification." <u>Id.</u>  However, the majority also noted, "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." <u>Id.</u> at 2714 n.6.

Justice Sotomayor's fifth and deciding vote delineates the opinion's reach:

> First, this is not a case in which the State suggested an alternate purpose, much less an alternate <u>primary</u> purpose, for the BAC report . . . .

> Second, this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue . . . .

> Third, this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence . . . .

> Finally, this is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph. . .

<u>Id.</u> at 2722 (Sotomayor, J., concurring in part).

## II. Bullcoming Applied

The present case activates all but one of Justice Sotomayor's caveats, placing into question how, if at all, <u>Crawford</u> applies to any of the underlying urinalysis documents in this case.  However, one need look no further than the first of these caveats to determine that there was no plain error in this case with respect to the DD Form 2624 and the certification

8

contained on it.  Bullcoming clearly establishes a purpose test as a core element of the Crawford analysis.  Indeed it suggests that the identification of an alternative purpose for the drug report and the information contained within it might change the analysis.  Contrary to the majority opinion's assertion, the sole purpose of military urinalysis testing in general, and particularly the information contained in the DD 2624 in this case, was not to "provid[e] urinalysis drug testing that is scientifically valid and forensically acceptable as evidence in courts of law," employing "certain procedures 'to ensure that the integrity of . . . the evidence has been . . . preserved.'" Sweeney, __ M.J. __ at (4) (alterations in original).  That is relevant testimony, for sure.  But it does not in fact address the question as to what, under Davis and Bullcoming, the primary purpose is behind military urinalysis testing in general, or more specifically what the primary purpose, or alternate purpose of the test and the information contained in the DD 2624 at issue in this case was at the time the form was filled out. Rather the quoted testimony responds to a line of questions about the reliability of urinalysis testing intended to give the members confidence in the result, not so that they can apply the Supreme Court's analysis in Davis.

Department of Defense regulations make it clear that, at minimum, there are alternate purposes for the creation of the

custodial document, certification, and related attachments.  The
military drug testing program operates under Department of
Defense regulations.  Dep't of Defense Dir. 1010.1, Military
Personnel Drug Abuse Testing Program (Dec. 9, 1994)
(incorporating Change 1, Jan. 11, 1999).  This directive
mandates three purposes for drug testing:  (1) to deter military
members and those entering active duty from abusing drugs; (2)
"to permit commanders to detect drug abuse and assess the
security, military fitness, readiness, good order, and
discipline of their commands"; and (3) "as a basis to take
action, adverse or otherwise (including referral for treatment),
against a Service member based on a positive test result."  Id.
at para. 3.1.  The certification at the bottom of the DD 2624
therefore serves more than one purpose.  It assures commanders
as well as members of the armed forces -- including those who
have not engaged in unlawful conduct -- that the program is
being administered as intended.  In other words, the
certification helps to assure military members that they will
not be victims of false positive tests.  It also assures
commanders that they have an accurate understanding of the
degree, if any, of controlled substance use (authorized and
unauthorized) in their unit.  And, of course, the document can
serve as a basis to initiate administrative, disciplinary, or

criminal proceedings against a servicemember and provide a forensically sound basis for so doing.[8]

It is also noteworthy that the mission statement of the Navy Drug Screening Laboratory that created the Form DD 2624 at issue here includes a purpose distinct from the production of forensic evidence for prosecution.  Indeed, the stated mission of the Navy Alcohol and Drug Abuse Prevention program under which the urinalysis testing is authorized, is to "support Fleet readiness by fighting alcohol abuse and drug use."[9]  Thus, it is clear that the laboratory has an alternate purpose for testing, documenting, and certifying laboratory reports.  This readiness purpose is reflected in the Military Rules of Evidence (M.R.E.) as well.

With the possible exception of a probable cause urinalysis, most urine collections are considered inspections under M.R.E. 313.  Under the rule, "[a]n 'inspection' is an examination of . . . a unit . . . as an incident of command the primary purpose of which is to determine and to ensure the security, military

---

[8] The majority misapprehends the distinction between the majority and this dissent.  The purpose of the drug testing is not determinative of the purpose behind any statements that may be testimonial that are contained in drug testing reports. However, the dissent believes that the purpose of the test may inform one's judgment as to the purpose of any statement in the resulting report.

[9] Navy Alcohol and Drug Abuse Prevention (OPNAV 135F), http:// www.public.navy.mil/bupers-npc/support/nadap/Pages/default2.aspx (last visited August 29, 2011).

fitness, or good order and discipline of the unit."  M.R.E.

313(b).  It is unclear how one would assess the collection of

M.R.E. 313(b) samples under the "primary purpose" test,

including the test results documented on the DD 2624 in this

case, because it has not been litigated and addressed.  However,

what is clear is that any documents and statements recording and

validating the results of such an inspection, both positive and

negative, would have as an alternate purpose, if not a primary

purpose, the "military fitness, or good order and discipline of

the unit."  This contrasts with the cover memorandum, which is a

document generated after the results of an inspection became

known, and after the decision to prosecute was taken for the

sole purpose of presenting evidence at court-martial.

Further, the record in this case suggests that the

technicians conducting the lab testing would not necessarily

anticipate the use of even positive results and their recording

and validation of these results in criminal proceedings.  Of

course, questions were not posed to the witnesses at trial to

explore this point of the Crawford analysis.[10]  However, civilian

senior chemist Marinari testified that of the one million

---

[10] Whether this is important or not depends on how one reads the
Crawford terminology:  "statements . . . made under
circumstances which would lead an objective witness reasonably
to believe that the statement would be available for use at a
later trial."  541 U.S. at 52.

12

samples tested in the Navy and Marine Corps that year, ninety-nine percent were negative, which suggests that approximately ten thousand were screened positive.  Given that there were 2966 total cases tried by court-martial involving all offenses in the Navy and Marine Corps for that year,[11] clearly not all positive urinalyses or their corresponding reports led to or were used at courts-martial.  Indeed, it suggests that only a small percentage of such testing lead to courts-martial.  In such a context, one would not expect a technician or lab supervisor to prepare a lab document with the assumption that it would be used for criminal prosecution.  Moreover, the Army Health Promotion/Risk Reduction/Suicide Prevention Report (2010) (2010 Report) confirms that a majority of positive test results do not go to criminal prosecution in the military.[12]

This is not to say that the primary purpose, sole purpose, or an alternate purpose behind the use of the laboratory results, laboratory certifications, or laboratory forms in this

---

[11] Annual Report of the Code Committee on Military Justice 14 (2007), reprinted in 67 M.J. LXXIII, CXXX (2008).

[12] The Medical Review Officer "clearance rate," defined as "the percentage of excused positive tests" for warriors using prescription drugs in 2009 was 90%.  2010 Report at 44-45. Moreover, in 2009 there were 1,415 illicit drug use positives (excluding marijuana) not reported to law enforcement, and "consider[ing] the fact that 25% of all investigated drug cases lead to multiple subjects, this number could be closer to 2,000 drug related subjects."  2010 Report at 60.

or any other case are, or are not, covered by Crawford.  The point is that while there is yet room for litigation over the underlying nature of military urinalysis documents, there was no obvious and clear error in this case beyond the admission of the cover memorandum.  The majority dismisses the existence of alternate purposes behind military drug testing by stating that the Government did not prove that there were any such purposes.  However, this is a plain error case.  Thus, the burden is on Appellant to demonstrate plain and obvious error not on the Government to demonstrate the lack of plain error.  As to whether further Crawford error might lurk within the confines of additional urinalysis documents is a matter that has not been fully litigated before or after Bullcoming affected Crawford's reach.[13]  It is tempting to create clarity with a blanket rule

---

[13] Justice Sotomayor's second and third concurring caveats are also in play, but are not essential to the outcome of this case.  Second, it is not clear after Bullcoming whether or not the testimony of Mr. Marinari as a lab supervisor is adequate under Crawford to satisfy the confrontation clause with respect to the underlying tests and materials.  Justice Sotomayor's concurrence does not answer this question, but puts it into play.  "It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results."  131 S. Ct. at 2722 (Sotomayor, J., concurring in part).  Is Mr. Marinari such an official?  Is he such an official for the purposes of Form DD 2624?  These questions were not litigated at trial for the purposes of Bullcoming and the parties have not had the opportunity to make their arguments on this point.

Justice Sotomayor's third caveat is implicated as well, though less directly.  That is because this is a case where the expert witness was asked for his independent opinion about underlying

that reaches beyond Crawford and Bullcoming.  But the issues
involved are too important and the impact is too significant to
apply Crawford in a robotic manner without first fully
litigating and exploring the nuances that the Supreme Court
identified in Bullcoming, as well as the military context in
which these issues are raised.

III.  The Military Context Has Not Been Addressed

There is an additional problem in applying Crawford in a
mechanical manner without further litigation:  the Supreme
Court's Crawford cases do not address military-specific
distinctions at all.  That should be done by this Court, in the
first instance.  At least three significant distinctions are in
play, in addition to those identified by Justice Sotomayor.
First, while the Supreme Court's analysis adopts a primary

---

testimonial reports; however, the underlying testimonial reports
were themselves admitted into evidence.  Thus, Bullcoming does
not speak directly to this case on this point, but it can be
read to suggest that where the reports themselves are admitted
there may be a Crawford problem.  In any event, Blazier II has
already addressed the basic point:  an expert witness may,
pursuant to M.R.E 703, offer an independent opinion about
underlying testimonial reports.  69 M.J. at 224; see United
States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009) ("Crawford
forbids the introduction of testimonial hearsay as evidence in
itself, but it in no way prevents expert witnesses from offering
their independent judgments merely because those judgments were
in some part informed by their exposure to otherwise
inadmissible evidence").  The harder and more contextual
question is whether the admission of such expert testimony can
render harmless the admission of Crawford-triggering report
testimony.  Our cases have not been litigated at the appellate
level with this issue in mind.

purpose test, and perhaps an alternate purpose test, the Supreme Court's discussion of alternative purposes is directed to medical or administrative purposes, but not a context where the alternate or primary purpose is military readiness. Whether that would or should change the analysis is not settled, and the issue has not been litigated or decided at any appellate level.

That also means that the Crawford cases do not address circumstances where there are potentially competing or countervailing constitutional principles found in Articles I and II. The constitutional issue in each of the Crawford cases is directed solely to the Confrontation Clause. Therefore, the question is open as to whether the analysis or interpretation might be different if, for example, additional constitutional authorities are implicated. If the President expressly authorized a urinalysis program for the purpose of military readiness, would that change the analysis? The question has not been litigated or addressed. To be clear, the issue is not whether the Confrontation Clause applies. It does. The question is how. However, if the analysis in the military context were that simple, we should simply cite the text of the Confrontation Clause and remand. Moreover, if it were that plain and obvious, then it should be clear which of the other underlying documents admitted constitute plain error.

Third, and least important, the practical impact of its ruling in <u>Bullcoming</u> was important enough to the Supreme Court that it was included in the Court's majority opinion and dissent.  Therefore, it should be fully litigated and addressed in the military context as well.  For example, the majority and dissenting opinions in <u>Bullcoming</u> address the administrative impact of the decision on the ability of state authorities and state laboratories to comply with <u>Crawford</u>, including the potential distances a lab technician might have to travel.  131 S. Ct. at 2728 (Kennedy, J., dissenting).  However, the opinion clearly is not intended to address the impact of <u>Crawford</u> on running a national and even worldwide military laboratory testing program.  Thus, the <u>Bullcoming</u> Court did not contemplate the potential for travel to Afghanistan, Iraq, or such other worldwide locations where a court-martial might occur, or the potential operational consequences of compelling commanders to withdraw servicemembers from the field for courts-martial in the continental United States to avoid the difficulties of procuring extensive travel for a laboratory technician.  Neither is it clear what the implications to military readiness, if any, will be if this Court applies <u>Crawford</u> as proposed by the majority. For example, will this Court's application of <u>Crawford</u> cause the government to revise the checks and balances currently used to ensure the military's urinalysis program is a reliable tool of

military readiness and discipline by limiting or avoiding the use of certifications?  Such issues should be explored as part of or parallel to any sweeping Crawford pronouncements.

## Conclusion

Based on the foregoing reasons, I would not find plain error in this case with respect to any of the urinalysis documents other than the cover memorandum.  I would not reach further.  Given the importance of the Crawford line of cases in upholding an accused's right to confrontation and given the importance of the urinalysis program to military readiness and not just discipline -- in short, the larger importance of performing drug tests and ensuring their accuracy -- such conclusions should await the full litigation of the issues identified above.

Whether the admission of the cover memorandum was harmless beyond a reasonable doubt is a question of prejudice that this Court is well situated to address.  A remand on this point could be reasonable in light of the expertise of Courts of Criminal Appeals in assessing trial impact.  However, in this uncertain and changing context, this Court should take the lead in addressing prejudice in this case.  It is this Court and perhaps ultimately the Supreme Court, and not the Courts of Criminal Appeals, that will determine which of the underlying documents,

18

marks, and measurements are "testimonial" and what weight such testimony bears.